UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOSEPH AMBROSE,

        Petitioner,                      Case Number 06-13361-BC
                                                  Honorable Thomas L. Ludington

v.

RAYMOND D. BOOKER,

        Respondent.
_____/

## ORDER ADOPTING REPORT AND RECOMMENDATION, OVERRULING RESPONDENT'S OBJECTION TO REPORT AND RECOMMENDATION, AND CONDITIONALLY GRANTING PETITIONER A WRIT OF HABEAS CORPUS

Petitioner Joseph Ambrose filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, on July 25, 2006. On April 19, 2001, Petitioner was convicted by a jury in Kent County Circuit Court of two counts of armed robbery, one count of carjacking, and one count of felony-firearm. In his petition, Petitioner advances the single claim that he was denied his Sixth Amendment right to be tried before a jury drawn from a fair cross-section of the community because a computer "glitch" systematically excluded minorities from the jury venire at the time of his trial. *See Taylor v. Louisiana*, 419 U.S. 522, 530 (1975) (noting that "the fair-cross-section requirement [i]s fundamental to the jury trial guaranteed by the Sixth Amendment").

With the exception of the filing of the habeas petition and an application to proceed in forma pauperis, Petitioner has been represented by counsel throughout the proceedings in this Court. *See* [Dkt. # 25, Oct. 15, 2008] (order appointing Kenneth Sasse as counsel for Petitioner). On February 6, 2007, Respondent filed a response [Dkt. # 6] to the habeas petition, arguing that Petitioner's claim

was procedurally defaulted because he did not object to the composition of the jury before it was empaneled and sworn and only raised the issue for the first time in state court collateral proceedings.

On June 16, 2008, the Court determined that Petitioner was entitled to an evidentiary hearing and referred the matter to Magistrate Judge Charles E. Binder to conduct the hearing and prepare a report and recommendation. On October 26, 2009, Judge Binder held the evidentiary hearing and directed the parties to file briefs. *See* [Dkt. # 42] (Hr'g Tr.). On November 25, 2009, Petitioner filed a brief in support of his petition [Dkt. # 46]; on January 6, 2010, Respondent filed a brief in opposition to the petition [Dkt. # 50]; and on January 13, 2010, Petitioner filed a "reply" brief in support of his petition [Dkt. # 51].

On January 15, 2010, Judge Binder issued a report and recommendation [Dkt. # 52]. Judge Binder concluded that Petitioner established a prima facie case that he was denied his Sixth Amendment right to a fair and impartial jury drawn from a fair cross-section of the community. On January 29, 2010, Respondent filed objections [Dkt. # 53] to the report and recommendation, asserting that Petitioner's claim is procedurally defaulted, and that Petitioner cannot establish a prima facie case. Petitioner did not file a response to the objections, but filed supplemental legal authority on March 31, 2010, and July 7, 2010. *See* [Dkt. # 53, 55].

As explained below, Judge Binder's report and recommendation will be adopted and Respondent's objections overruled. In addition, Respondent cannot rebut Petitioner's demonstration of a prima facie case, because Respondent does not contend that the computer glitch that resulted in the significant underrepresentation of minorities in the jury venire furthered a significant state interest. Thus, Petitioner will be granted a conditional writ of habeas corpus.

I

Petitioner was convicted by a Kent County jury on April 19, 2001, of two counts of armed

robbery, one count of carjacking, and one count of felony-firearm. On June 19, 2001, the Kent County Circuit Court sentenced Petitioner to fifteen to sixty years of imprisonment for each of the armed robbery convictions and ten to fifty years of imprisonment for the carjacking conviction, each sentence to be served concurrently. The court also sentenced Petitioner to two years of imprisonment for the felony-firearm conviction, to be served consecutively.

On direct review, Petitioner's convictions were affirmed by the Michigan Court of Appeals. *People v. Ambrose*, No. 235591 (Mich. Ct. App. Apr. 10, 2002). Petitioner sought to raise claims regarding the ineffective assistance of counsel, judicial bias, insufficient evidence, and an inaccurate sentence. However, Petitioner's appointed appellate counsel filed a motion to withdraw from representation because counsel was unable to identify any issues of arguable merit. The Michigan Court of Appeals granted counsel's motion and determined that Petitioner's appeal would be frivolous. *Id.* Petitioner did not file an application for leave to appeal in the Michigan Supreme Court.

In October 2003, Petitioner filed a motion for relief from judgment in the trial court, raising the following claim:

> When Kent County has acknowledged [publicly] that because of an error in its computer system, nearly seventy-five percent of the county's eligible jurors were being excluded from jury pools during the time when jurors were selected in this case, and they were being excluded in a manner that resulted in an injustice to [Petitioner] who was denied his constitutional right to a jury drawn from a venire representative of a fair cross-section of the community.

The trial court denied Petitioner's motion for relief from judgment because Petitioner

> did not properly preserve his challenge to the jury array by raising the issue before the jury was empaneled and sworn, . . . there is no evidence in the record to support defendant's argument; and . . . the Court may not take judicial notice of newspaper articles submitted in support of the motion because they constitute inadmissible hearsay.

*People v. Ambrose*, No. 00-09844-FC (Kent County Cir. Ct. Oct. 14, 2003). Petitioner's motion for

reconsideration was denied on November 13, 2003.

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, raising the same claim as in his motion for relief from judgment. Petitioner sought a remand to the trial court for an evidentiary hearing to develop a factual record for his claim. The Michigan Court of Appeals denied leave to appeal, without specifically addressing Petitioner's request for remand. *People v. Ambrose*, No. 256405 (Mich. Ct. App. Dec. 16, 2004).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same jury pool composition claim. Petitioner also filed a motion to remand to the trial court to develop the factual record. On November 29, 2005, the Michigan Supreme Court denied leave to appeal. *People v. Ambrose*, 706 N.W.2d 16 (table) (Mich. Nov. 29, 2005). Petitioner's motion for reconsideration was denied. *People v. Ambrose*, 711 N.W.2d 19 (table) (Mich. Feb 27, 2006).

II

In the habeas petition now before this Court, Petitioner continues to pursue the single claim that he was denied a jury drawn from a fair cross-section of the community in violation of the Sixth Amendment. Initially, Petitioner attached two newsletter articles to support his claim. One article indicates that the Kent County prosecutor conceded that there was a problem in the jury selection process in Kent County from late 2001 to July 2002, which resulted in the selection of fewer jurors from a section of Kent County where a majority of African Americans reside. The second article provided, in part:

> [T]he Kent County Administrator admitted that a 16-month programming mistake excluded nearly 75 percent of the county's eligible residents from consideration as jurors. . . . Those excluded included residents of areas containing most of the county's communities of African-American, Latino, and other minority residents. The glitch in the programming started in spring of 2001 and lasted 16 months.

Petitioner's trial commenced on April 16, 2001.

On June 16, 2008, the Court entered an order determining that Petitioner was entitled to an evidentiary hearing on his claim. It was recognized that on habeas review a federal court must presume that all determinations of factual issues made by the state court are correct pursuant to 28 U.S.C. § 2254(d). However, no state court made factual findings regarding Petitioner's claim, despite Petitioner's diligent attempts to develop the factual basis for his claims through the state court collateral proceedings. *See Williams v. Taylor*, 529 U.S. 420, 437 (2000). Concluding that Petitioner could potentially establish a constitutional violation, the Court determined that Petitioner was entitled to an evidentiary hearing, and referred the matter to Judge Binder for an evidentiary hearing and report and recommendation.

III

In the report and recommendation, Judge Binder outlined the burden-shifting framework used to analyze an alleged violation of a petitioner's right to be tried before a jury drawn from a fair cross-section of the community. First, to establish a prima facie case, a petitioner must demonstrate the following:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). Judge Binder noted that it is not disputed that African-Americans are a "distinctive" group in the community. Thus, only the second and third elements are contested.

With respect to the second element, Judge Binder emphasized the utility of a "comparative disparity" analysis as compared to an "absolute disparity" analysis when the percentage of the "distinctive" group in the community is small. " 'Absolute disparity' is determined by subtracting

the percentage of African Americans in the jury pool . . . from the percentage of African Americans in the local jury-eligible population." *Berghuis v. Smith*, No. 08-1402, 559 U.S. - - - -, slip op., at *5 (Mar. 30, 2010). " 'Comparative disparity' is determined by dividing the absolute disparity . . . by the group's representation in the jury-eligible population." *Id.* This effectively "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Ramseur v. Beyer*, 983 F.2d 1215, 1231 (3d Cir. 1992).

Both tests are "imperfect" as they "can be misleading when . . . members of the distinctive group compose only a small percentage of those eligible for jury service." *Smith*, No. 08-1402, slip op., at *11-12. As the population of eligible members of the distinctive group decreases, the absolute disparity will approach 0%, while the comparative disparity will approach 100%. The U.S. Supreme Court has acknowledged that lower courts have relied on these measurements, and an additional "standard deviation" measurement, but has not "specifie[d] the method or test courts must use to measure the representation of distinctive groups in jury pools." *Id.* at *11.

With respect to the third element, Judge Binder explained that "systematic exclusion" need not be intentional, but the cause of the exclusion must be "inherent in the particular jury-selection process utilized." *Id.* at 366. After the petitioner establishes a prima facie case, the burden shifts to the respondent to demonstrate that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." *Id.* at 367-68. Judge Binder's report and recommendation did not address whether Respondent met this burden, likely because Respondent has conceded that the computer glitch did not serve a significant state interest.

Judge Binder summarized the evidence presented at the evidentiary hearing as follows:
One live witness, Wayne Bentley, was examined and several exhibits were stipulated to

-6-

and received into evidence in lieu of live expert testimony. Wayne Bentley, a teacher in the Grand Rapids Public Schools, testified that he has been a member of the Kent County Jury Commission since 1998. [Hr'g Tr. 14.] This unique board of three oversees the Kent County jury processes. (*Id.*) Mr. Bentley regularly took his government class to the Kent County Circuit Court to "go into the jury assembly room and count the minorities." (*Id.* at 15.)

Terry Holtrop, case management manager for the Kent County Circuit Court since 2001, testified in a deposition[1] that shortly after he became employed with the court, jury commissioner Wayne Bentley became vocal about the lack of minorities in the jury pools. [Holtrop Tr. 6.] Concern about the racial composition of the venire "came to a head" in September of 2001 after Mr. Bentley's high school class created a report on the issue as part of a class project. (*Id.* at 9-10.) The Kent County Jury Management System Report (hereafter "the Report") dated August 1, 2002 [Dkt. # 40-3, p. 12 of 52],[2] describes the genesis of the computer error described by Mr. Bentley during his hearing testimony. The Report first indicates that the random number generator used in the County's jury management system functioned properly and therefore, was not the source of any problems. [Dkt. # 40-3, p. 16 of 52]. The Report indicates that in April 2001, the job of updating and loading the state files of eligible jurors was taken over by the county as part of a cost-cutting effort. [Dkt. # 40-3, p. 15 of 52] The Report explains:

> [I]n the initial set-up of the Oracle database to accommodate the driver's license and State ID data from the State file, an error was made in one parameter. Whether this was a programming error, the carry-over of a setting that existed within the Sybase database, misinterpreting instructions, or simply human error, that is now almost impossible to determine. The parameter that was entered within the database was 118,169. What should have been inserted within this setting was the total number of records in the State File, or 453,981 in 2001.
>
> The net effect of this incorrect parameter is that the Jury Management System performed a random selection against the first 118,169 jurors on the file. The percentage of jurors selected per Zip Code was proportional to the Zip Code composition of the first 118,169 records - but not Kent County as a whole. The total pool of prospective jurors from the State File is of course 3.8 times larger than the 118,169 and hence the type of jury pull data as is evidenced in the various tables included in this report, for the second half of 2001 and the first half of 2002.
>
> The next logical question being, why then did the jury pull from Zip Code 49341 jump so dramatically for 2001, from an average of 3.8% up to 10.24% . . . and why did the jury pulls from Zip Code 49507 decline from an average of 8.56% to 2.13%?

---

[1] This deposition was taken for presentation in the Eastern District of Michigan case of *Powell v. Howes*, Case No. 05-71345. On September 22, 2009, U.S. District Judge Denise Page Hood granted a motion to stay and the case is held in abeyance so that the petitioner may return to state court and fully exhaust his administrative remedies.

[2] The Report was an exhibit included with Terry Holtrop's deposition.

> The answer being that in 1998 (as was mentioned previously) the State File did not come in random order, but rather in Zip Code order . . . lowest numbers to highest numbers. In subsequent years, new prospective jurors (either based on age or having moved to the County) were added to the end of the database. Existing prospective jurors (those that were on file the previous year) would simply have address information updated based on what the State provided. Their position in the dataset would not change. Therefore, the first 118,169 records of the dataset have a high percentage of lower numbered zip codes. As indicated on the map included in his packet, all the Zip Codes with the lower numbers are located outside of the Grand Rapids metro area.

[Dkt. # 40-3, pp. 15-16 of 52]. The Report indicated that the error occurred from April 2001 through July 2002 and that the error had been corrected as of the date of the Report, i.e., August 1, 2002. [Dkt. # 40-3, p. 16 of 52]. I note that . . . Petitioner Ambrose's trial was held on April 16-19, 2001. (Doc. 16.) Thus, . . . Petitioner[] w[as] affected by the computer error discussed above.

Since that time, Mr. Holtrop has conducted and distributed statistical analyses of the racial composition of the Kent County jury pools. [Holtrop Tr. 18.] Mr. Holtrop indicated that sometime after November 2001, the county implemented Commissioner Bentley's suggestion that when a jury questionnaire is returned from a particular zip code, another questionnaire be sent to someone from that same zip code to help increase minority representation. (*Id.* at 13-14.) Mr. Holtrop stated that since the 2002 computer system change to correct the zip code bias, he does not believe that there have been any problems with underrepresentation. [Holtrop Tr. 54].

A report prepared by Paul L. Stephenson, III, Ph.D., was also submitted. [Dkt. # 40-3, p. 43 of 52.] Dr. Stephenson's report was made for Judge Dennis Kolenda of the Kent County Circuit Court and it analyzed the Kent County jury pool for the trial (*People v. Bryant*) held in January 2002. (*Id.*) Dr. Stephenson concluded that the absolute disparity test "result indicates that there is a 6.03 percent difference between the percentage of eligible Black and African Americans in Kent County and the actual percentage in the venire." [Dkt. # 40-3, p. 45 of 52.][3] Dr. Stephenson further concluded that the comparative disparity test showed that the Bryant trial "had 73.1% fewer Black or African American members than could have been expected in Kent County." (*Id.*) Dr. Stephenson suggests that neither the absolute nor comparative disparity tests are "viable for inferential purposes" because they are "not capable of identifying whether this group is statistically significantly underrepresented and small changes in the venire representation will unduly distort the analysis . . . ." (*Id.*) Using the standard deviation and binomial tests, Dr. Stephenson concluded that there was "insufficient evidence to demonstrate that the representation of Blacks or African Americans <u>in the venire</u> is biased, this is in part due to the size of the

---

[3] The Court notes that in *People v. Bryant*, No. 241442, 2004 WL 513664, at *3 (Mich. Ct. App. Mar. 16, 2004), the Michigan Court of Appeals stated that the absolute disparity in that case was 5.08% which did not constitute a substantial underrepresentation, but the court nevertheless remanded the case to the trial court to allow presentation of additional evidence.

-8-

venire." [Dkt. # 40-3, p. 46 of 52](emphasis in original).  After employing the Chi-square Goodness-of-fit test, Dr. Stephenson found that "there is essentially no chance of acquiring the results we obtained if the selection process for potential jurors is unbiased.  As a result, there is overwhelming evidence to conclude that the selection process <u>for terms </u>during the first months of 2002 was biased." [Dkt. # 40-3, p. 47 of 52] (emphasis in original).  Dr. Stephenson's summary stated that a "systematic bias did exist in the selection of individuals summoned for jury duty during the first three months of 2002.  This bias would have inevitably led to underrepresentation of Black or African Americans in the terms during this period of time.  However, because the venire in the case of *People v. Bryant* contained at least one Black or African American potential juror, there is insufficient evidence to conclude that the venire in this case was significantly biased." [Dkt. # 40-3, p. 49 of 52] (emphasis in original).

   The parties also submitted a report by Edward Rothman, Ph.D., who performed an analysis of the Kent County Jury Pool between January 1998 and December 2002. [Dkt. # 45-2].  Dr. Rothman's analysis concluded that the period between April 2001 and August 2002 revealed significantly more underrepresentation of African Americans than the earlier period studied. [Dkt. # 45-2, pp. 7-9 of 17].  Dr. Rothman found that the absolute disparity between jury-eligible African Americans and those who appeared on jury venires was 3.45% between April 2001 and August 2002. [Dkt. # 45-2, p. 2 of 17].  Dr. Rothman further concluded that the comparative disparity during this time period was 42%.  (*Id.*)

[Dkt. # 52] (footnotes and emphasis in original).

Based on the record summarized above, Judge Binder concluded that Petitioner established the second and third elements of a prima facie case.  With respect to the second element, Judge Binder concluded that the absolute disparity of 3.45% and a comparative disparity of 42% met the requirement that the representation of African-Americans in venires from which juries were selected in Kent County at the time of Petitioner's trial was not "fair and reasonable in relation to the number of such persons in the community."  While acknowledging contrary decisions from other federal Courts of Appeals, Judge Binder relied primarily on the Sixth Circuit's determination in *Smith v. Berghuis*, wherein the requirement was met when there was an absolute disparity of 1.28% and a comparative disparity of 34%.  543 F.3d 326 (6th Cir. 2008).  As will be discussed further below, subsequent to the issuance of Judge Binder's report and recommendation, the Supreme Court reversed the Sixth Circuit decision on other grounds.

With respect to the third element, Judge Binder concluded that the requirement of "systematic exclusion" was met because the computer glitch was inherent to the selection process, regardless of how the mistake originated. Thus, Judge Binder recommended that Petitioner established a prima facie case of the violation of his Sixth Amendment right to be tried before a fair and impartial jury drawn from a fair-cross section of the community.

IV

Respondent raises three objections to Judge Binder's report and recommendation. First, Respondent argues that Petitioner's claim is procedurally defaulted, an issue that Judge Binder did not address in the report and recommendation. Second, and third, Respondent objects that Petitioner cannot establish the second and third elements of a prima facie case of a Sixth Amendment violation. As explained below, each objection will be overruled.

A

First, Respondent objects that Petitioner's claim is procedurally defaulted. To determine whether a claim is procedurally defaulted, four "inquiries" are necessary. *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1996). "First, the court must determine whether there is such a procedural rule that is applicable to the claim at issue and whether the petitioner did, in fact, fail to follow it." *Id.* at 673 (citing *Maupin*, 785 F.2d at 138). "Second, the court must decide whether the state courts actually enforced its procedural sanction." *Id.* (citing *Maupin*, 785 F.2d at 138). "Third, the court must decide whether the state's procedural forfeiture is an 'adequate and independent' ground on which the state can rely to foreclose review of a federal constitutional claim." *Id.* "[F]ourth, the petitioner must demonstrate, consistent with *Wainwright v. Sykes*, 433 U.S. 72 (1977), that there was 'cause' for him to neglect the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Greer*,

264 F.3d at 672 (citations omitted).

Here, Respondent contends that Petitioner was required by a state rule to object to the composition of the jury before it was empaneled and sworn in order to preserve the claim, but did not do so. In addition, the state trial court denied Petitioner's motion for relief from judgment because he did not preserve his claim by objecting at trial. *People v. Ambrose*, No. 00-09844-FC (Kent County Cir. Ct. Oct. 14, 2003). Therefore, assuming that the state's rule requiring an objection to a jury array prior to the jury being sworn is a firmly established state procedural rule that is regularly followed, *Warner v. United States*, 975 F.2d 1207, 1213-14 (6th Cir. 1992), the primary issue is whether Petitioner can establish " 'cause' for him to neglect the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Greer*, 264 F.3d at 672.

While the Court did not address this issue prior to the evidentiary hearing, both Petitioner and Judge Binder reasonably concluded that the Court determined that Petitioner's claim was not procedurally defaulted when it ordered an evidentiary hearing. However, a procedural default is not a jurisdictional bar to review of a habeas petition on the merits. *Trest v. Cain*, 522 U.S. 87, 89 (1997). Thus, judicial economy may favor addressing the merits first, particularly if a claim is "easily resolvable against the habeas petitioner, whereas the procedural bar issue involves complicated issues of state law." *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997).

Two cases addressing habeas petitioners' claims arising out of the same computer glitch in Kent County are particularly instructive as to whether Petitioner can demonstrate "cause" and "prejudice" in this case. First, in *Parks v. Warren*, a court in the Eastern District of Michigan determined that the claim of a petitioner whose trial took place in Kent County Circuit Court in October 2001 was not procedurally defaulted, because the petitioner demonstrated both "both cause and prejudice that excuse his failure to abide by [the state] rule." 574 F. Supp. 2d 737, 744 (E.D.

Mich. 2008) (Lawson, J.). The court explained that "[a] habeas petitioner shows 'cause' where he demonstrates that he failed to raise a constitutional issue because it was 'reasonably unknown to him' at the time." *Id.* (quoting *Fautenberry v. Mitchell*, 515 F.3d 614, 629 (6th Cir. 2008)) (further quotations & citations omitted). The court concluded that the petitioner "could not have known of Kent County's computer deviation at or before the time of jury selection," because "[c]ounty officials did not even know about it, having discovered it several months after the petitioner's trial." *Id.*

The court also concluded that "prejudice is presumed," because "the denial of a jury pool comprised of a fair cross-section of the community . . . can only be characterized as a structural error." *Id.*; *see also id.* at 744-45 (citing *Vazquez v. Hillery*, 474 U.S. 254, 263-64 (1986), for the proposition that "[w]hen potential jurors are excluded from the jury pool on the basis of race, structural error occurs"). The court explained that "structural errors" "defy analysis by 'harmless-error' standards because they affect the framework within which the trial proceeds, and are not simply an error in the trial process itself." *Id.* (quoting *United States v. Gonzalez*, 548 U.S. 140, 148-49 (2006) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991))). Thus, because the petitioner did not need to demonstrate actual prejudice, and demonstrated cause, the court determined that it was appropriate to reach the merits of the petitioner's claim. *Id.* at 745.

In contrast, a court in the Western District of Michigan determined that the claim of a petitioner whose trial took place in Kent County Circuit Court in May 2001 was procedurally defaulted, because the petitioner could not demonstrate cause for not objecting to the jury panel. *Carter v. Lafler*, No. 1:09-CV-215, 2010 WL 160814, at *3 (W.D. Mich. Jan. 8, 2010) (Jonker, J.). The court reasoned that the petitioner "did not need to know about the precise nature of the computer problem in the jury selection to see a deficiency in the jury array." *Id.* (citing *Wellborn v. Berghuis*,

No. 1:05-CV-346, 2009 WL 891708, at *3 (W.D. Mich. Mar. 31, 2009) (Jonker, J.)).  The court emphasized that the petitioner "absolutely personally observed the racial composition of his jury venire and finally selected jury." *Id.* (quoting *Wellborn*, No. 1:05-CV-346, 2009 WL 891708, at *3).

Finally, the court distinguished *Amadeo v. Zant*, 486 U.S. 214 (1998), upon which the petitioner relied, because the petitioner did not allege, or advance any evidence of, "any intentional effort to exclude any particular racial or gender group from the jury venire." *Carter*, No. 1:09-CV-215, 2010 WL 160814, at *3.  The court explained that in *Amadeo*, "the district attorney and jury commissioners of Putnam County, Georgia, intentionally engineered a scheme to under-represent African Americans and women in the County's juries, and to conceal the scheme by keeping the under-representation sufficiently subtle to fall within the presumptively acceptable statistical guidelines of prevailing case law." *Carter*, No. 1:09-CV-215, 2010 WL 160814, at *3 (citations omitted).  The petitioner's appeal is now pending.  *See Carter v. Lafler*, No. 10-1332 (6th Cir. filed Feb. 3, 2010).

In this case, Respondent concedes that exclusion need not be intentional.  In addition, Petitioner challenges the composition of the jury pool, the source of the jury venire, rather than the specific venire selected for his trial.  *See Smith*, No. 08-1402, slip op., at *1 ("The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury *drawn from sources reflecting a fair cross section of the community*.") (citation omitted) (emphasis added).

Moreover, *Carter* was transferred to the Western District of Michigan from the Eastern District of Michigan, and prior to the transfer, the court in the Eastern District concluded that the petitioner had not procedurally defaulted his claim.  *Carter v. Lafler*, No. 06-10552, 2009 WL 649889, at * 2 (E.D. Mich. Mar. 10, 2009) (Borman, J.).  As in *Parks*, the court explained that "the factual basis of petitioner's fair cross-section claim was reasonably unknown to Petitioner and his

counsel at the time the jury was sworn" when "[t]he alleged systematic exclusion resulted from an unknown computer glitch that was not discovered until several months after Petitioner's conviction." *Carter*, No. 06-10552, 2009 WL 649889, at * 3. Underlying the district court's decision was a report and recommendation by a magistrate judge, which accurately and persuasively observed that "[t]he composition of petitioner's venire alone should not have spurred counsel to lodge an objection, because it is . . . well established that 'evidence of a discrepancy on a single venire panel cannot demonstrate systematic exclusion.' " *Id.* at *8 (Komives, M.J.) (quoting *United States v. Horne*, 4 F.3d 579, 588 (8th Cir. 1993), and citing *United States v. Williams*, 264 F.3d 561, 568 (5th Cir. 2001); *United States v. Hill*, 197 F.3d 436, 445 (10th Cir. 1999); *United States v. DeFries*, 129 F.3d 1293, 1301 (D.C. Cir. 1997)). Anecdotal observations about the racial composition of a single venire, as the statistical experts corroborate, will rarely inform counsel or the court about whether a systematic problem exists in assembling the jury pool.

While neither of the Eastern District of Michigan decisions in *Parks* nor *Carter* are binding on this Court, their reasoning is persuasive. Thus, even assuming that the state's rule requiring an objection to a jury array prior to the jury being sworn is a firmly established state procedural rule that is regularly followed, Petitioner's claim is not procedurally defaulted. Petitioner has demonstrated cause for failing to raise the issue, since the underrepresentation caused by the computer glitch was "reasonably unknown" to Petitioner and his counsel at the time of trial. Respondent's objection that Petitioner's claim is procedurally defaulted will be overruled.

B

Respondent next objects that Petitioner cannot establish the second element of a prima facie case, that is, that the representation of African-Americans in the jury pool in Kent County at the time of Petitioner's trial was not "fair and reasonable in relation to the number of such persons in the

community." Respondent acknowledges that the absolute disparity at the time of Petitioner's trial was at least 3.45% and that the comparative disparity was at least 42%. Making a prediction that the Sixth Circuit's decision in *Smith* would be reversed, as it now has been, Respondent urges this Court to rely on *United States v. Buchanan*, wherein the Sixth Circuit determined that there was no violation of the fair cross-section requirement when there was an absolute disparity of 1.72% and a comparative disparity of 37.5%. 213 F.3d 302, 310 (6th Cir. 2000).

Respondent contends that other federal Courts of Appeals have rejected fair cross-section claims supported by "similar" statistics. *See, e.g.*, *United States v. Orange*, 447 F.3d 792, 798-99 (10th Cir. 2006) (rejecting an absolute disparity of 3.57% and comparative disparity of 51.22%, and collecting cases); *United States v. Weaver*, 267 F.3d 231, 241, 243 (3d Cir. 2001) (rejecting an absolute disparity of 1.23% combined with a comparative disparity of 40.01%, and an absolute disparity of 0.71% combined with a comparative disparity of 72.98%); *United States v. Royal*, 174 F.3d 1, 10 (1st Cir. 1999) (rejecting absolute disparity of 2.97%); *United States v. Rioux*, 97 F.3d 648, 657-58 (2d Cir. 1996) (rejecting absolute disparity of 2.14%); *United States v. Ashley*, 54 F.3d 311, 313-14 (7th Cir. 1995) (rejecting an absolute disparity of 3% when nothing suggests that "this discrepancy amounts to anything more than a statistical coincidence"). [4]

Petitioner acknowledges that the U.S. Supreme Court reversed the Sixth Circuit's decision in *Smith*, 543 F.3d 326. Petitioner emphasizes, however, that the Supreme Court declined the state's invitation to establish a bright line rule requiring that an absolute disparity exceed 10% for a petitioner to establish the second element of a fair cross-section claim. *Smith*, No. 08-1402, slip op., at *5 n.4. While not reaching the issue, the Court noted that such a rule "offers no remedy for

---

[4] Although Respondent also highlights *United States v. Rogers* for rejecting similar statistics, the court actually found that the second element of a prima facie case was established based on a comparative disparity of 30.96%, despite an absolute disparity of only 0.579%. 73 F.3d 774, 776-77 (8th Cir. 1996).

complete exclusion of distinct groups in communities where the population of the distinct group falls below the ten percent threshold." *Id.* The Court expressly declined to require or encourage the use of any one statistical test over another. *Id.* at *12.

More importantly, Petitioner emphasizes that the Court reversed the Sixth Circuit's decision with respect to the third element of a prima facie case, systematic exclusion.[5] Thus, Petitioner contends that the Sixth Circuit's *Smith* analysis regarding the second element is still persuasive. Consistent with that proposition, Petitioner encourages the Court to focus on the comparative disparity test, further relying on *People v. Bryant*, No. 280073, - - - N.W.2d - - - -, 2010 WL 2836119 (Mich. Ct. App. July 20, 2010), which addressed the same computer glitch at issue in this case.[6]

In *Bryant*, the Michigan Court of Appeals recognized that absolute disparity analysis is of little use when the distinct group is small, particularly because the court's previous decisions concluded that absolute disparities ranging from 2% to 11.5% were legally insignificant. *Bryant*,

---

[5] Applying the standard of review required by § 2254(d), the Court found that the Michigan Supreme Court had not unreasonably applied federal law when it determined that the petitioner did not establish systematic exclusion. *Smith*, No. 08-1402, slip op., at *14. While *Smith* also addressed jury selection in Kent County Circuit Court, the petitioner's claims did not involve the computer glitch present here, but the order in which jurors were selected to serve in either the state circuit or district courts, and other social and economic factors. *See, e.g.*, *id.* at *6. The Court concluded that "Smith's evidence gave the Michigan Supreme Court little reason to conclude that the district-court-first-assignment order had a significantly adverse impact on the representation of African-Americans on Circuit Court venires." *Id.* at *14.

Petitioner contends that here, unlike in *Smith*, the racial impact of the challenged procedure is not debatable, or disputed. While the computer glitch did not exclude only African Americans or other minorities, it undisputably affected them disproportionally and actually caused the documented underrepresentation in the jury pool. Moreover, Petitioner emphasizes that here, the Court is not bound by the AEDPA's deferential standard of review, because the state courts did not reach the merits of Petitioner's claim. *Cone v. Bell*, 129 S. Ct. 1769, 1784 (2009) (citations omitted). "Instead, the claim is reviewed *de novo*." *Id.* (citations omitted).

[6] Petitioner actually provided a citation to the June 22, 2010 decision, which was vacated and replaced by the July 20, 2010 decision. The new opinion merely fixes an incorrect assertion that the prosecutor did not file a brief on appeal. *People v. Bryant*, No. 280073 (Mich. Ct. App. July 20, 2010) (order vacating June 22, 2010 opinion).

No. 280073, slip op., at *3. Thus, in Kent County, where African-American voters make up only 8.25 % of eligible voters, the absolute disparity would never be sufficient to establish a constitutional violation. *Id.* at *3-4. In contrast, the court concluded that "the comparative disparity method at least yields a calculation that is indicative of the underrepresentation of African-Americans in defendant's venire." *Id.* at *4. The court found that the venire's comparative disparity of 73.1% was sufficient to establish the second element of a prima facie case under *Duren*. *Id.* at *5 (citing *United States v. Rogers*, 73 F.3d 774, 777 (8th Cir. 1996) (finding a comparative disparity of 30.96% to be sufficient)).

The question this Court now faces is whether to follow the course that the Sixth Circuit chartered in *Smith* and decide, based on the similar comparative disparities, that the second element is met in this case. In fact, the comparative disparity in this case, 42%, is even higher than the 34% in *Smith*. It is higher than the 31% that the Eighth Circuit concluded was sufficient in *Rogers*. 73 F.3d at 777. Moreover, the First Circuit and Second Circuit cases cited by Respondent for "similar" statistics did not analyze a comparative disparity, *see Royal*, 174 F.3d at 10, and *Rioux*, 97 F.3d at 657-58, and the Third Circuit case rejecting comparative disparities of 40.01 % and 72.98% was also faced with absolute disparities of only 1.23% and 0.71%, respectively, *see Weaver*, 267 F.3d at 241, 243. The absolute disparity in this case was much higher, at 3.45%. While the Seventh Circuit rejected an absolute disparity of 3%, the court noted at the same time that there was nothing to suggest that "this discrepancy amounts to anything more than a statistical coincidence." Here, the discrepancy was indisputably caused by the error in compiling the jury pool. Indeed, Dr. Stephenson's rejection of both the absolute and comparative disparity tests as statistically inadequate and his adoption of the Chi-square Goodness-of-fit test result as demonstrating the underrepresentation of African Americans in the jury pool is unrebutted.

Of the cases cited by Respondent in its objection, that leaves only the Tenth Circuit's decision in *Orange*, wherein the court rejected an absolute disparity of 3.57% and comparative disparity of 51.22%. 447 F.3d at 798-99. The court relied on its earlier cases rejecting similar, and larger disparities. *Id.* However, a review of the Tenth Circuit cases does not reveal a persuasive rationale. Despite its reversal on other grounds, it is prudent to follow the Sixth Circuit's decision in *Smith*. Petitioner has established that the representation of African-Americans in the jury pool in Kent County at the time of his trial was not "fair and reasonable in relation to the number of such persons in the community." Thus, Respondent's objection will be overruled.

C

Third, and finally, Respondent objects that Petitioner did not establish the third element of a prima facie case, systematic exclusion, because the underrepresentation of African-Americans in the jury pool was the result of a "class-neutral" computer error, as opposed to social or economic factors tied to a distinct group. Respondent emphasizes that "the erroneous data parameter that caused the underrepresentation was a misstatement of the total population of potential jurors," that "entry of the records into the system was not tied to any group, but rather numerical and chronological order," and that "[t]his error had the effect of excluding residents based on their zip code and the length of time living at their address, not on any category limited to a distinctive group."

As Petitioner points out, however, exclusion of the majority of residents from particular zip codes from the jury pool had a disproportionate effect on minorities, particularly African Americans, because those zip codes had significant minority populations, as compared to the zip codes from which residents were not erroneously excluded. While it is true that minorities were not the only eligible individuals excluded, there is undisputed evidence that they were disproportionately

-18-

excluded. Thus, the error was not "class-neutral" as Respondent now asserts. The computer glitch in Kent County resulted in the systematic exclusion of African Americans from the jury pool at the time of Petitioner's trial. Thus, Respondent's objection will be overruled.

V

Accordingly, it is **ORDERED** that the report and recommendation [Dkt. # 52] is **ADOPTED**.

It is further **ORDERED** that Respondent's objection to the report and recommendation [Dkt. # 53] is **OVERRULED**.

It is further **ORDERED** that Petitioner is **CONDITIONALLY GRANTED** a writ of habeas corpus. Respondent shall release Petitioner from custody unless the State brings him to trial within 180 days.

s/Thomas L. Ludington  
THOMAS L. LUDINGTON  
United States District Judge

Dated: March 10, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 10, 2011.

s/Tracy A. Jacobs  
TRACY A. JACOBS

---