UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOSEPH AMBROSE,

        Petitioner,                         Case No. 06-13361
                                                    Honorable Thomas L. Ludington

v.

RAYMOND D. BOOKER,

        Respondent.
_____/

**OPINION AND ORDER CONDITIONALLY GRANTING
PETITIONER'S REQUEST FOR A WRIT OF HABEAS CORPUS**

A Kent County jury convicted Joseph Ambrose (Ambrose) on two counts of armed robbery, one count of carjacking, and one count of felony-firearm possession in April 2001. But a computer glitch in effect at the time of Ambrose's trial produced a jury venire with a statistically significant "underrepresentation of minorities." *Ambrose v. Booker*, 684 F.3d 638, 641 (6th Cir. 2012). So although he was entitled to a jury drawn from a fair cross-section of his community, *see Duren v. Missouri*, 439 U.S. 357, 359 (1979), Ambrose did not receive one.

Because Ambrose did not raise a contemporaneous objection to the unconstitutional jury venire, however, any claim that his petit jury was not drawn from a fair cross-section of the community has been procedurally defaulted.[1] Accordingly, before this Court will consider such a claim, Ambrose must demonstrate cause to excuse his default and that he was prejudiced by such error. *Lancaster v. Adams*, 324 F.3d 423, 437 (6th Cir. 2003).

After his direct appeal was denied by the Michigan courts, Ambrose filed a petition for habeas corpus under 28 U.S.C. § 2254, raising his fair cross-section claim. Although Ambrose

---

[1] Michigan employs a "contemporaneous objection rule" that requires parties to timely and specifically raise objections at trial. *Lancaster v. Adams*, 324 F.3d 423, 437 (6th Cir. 2003) (citing *People v. Schutte*, 613 N.W.2d 370, 377 (Mich. Ct. App. 2000)).

did not object to his jury venire, this Court found "good cause to excuse his default" because there was no way of knowing about the underlying computer glitch at the time of jury selection. *Ambrose*, 684 F.3d at 643. This Court also concluded that "prejudice is presumed because the denial of a jury pool comprised of a fair cross-section of the community can only be characterized as a structural error." Mar. 10, 2011 Order 12 (internal quotation marks, ellipsis, and citations omitted), ECF No. 56. Having concluded that there was cause to excuse Ambrose's procedural default, and presuming prejudice, the Court considered Ambrose's fair cross-section claim, which proved meritorious. As a result, the Court conditionally granted Ambrose's petition for habeas corpus.

The Sixth Circuit reversed and remanded the case, explaining that before this Court may consider Ambrose's fair cross-section claim—given that he failed to raise a contemporaneous objection to his jury venire—he must demonstrate "actual prejudice" to excuse his procedural default. In other words, prejudice cannot be presumed, and Ambrose must demonstrate "a reasonable probability that 'a properly selected jury [would] have been less likely to convict'" before the Court can consider the merits of his claim. *Ambrose*, 684 F.3d at 652 (quoting *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991)). It follows that to demonstrate actual prejudice—so that his fair cross-section claim can be considered—Ambrose must first satisfy the "particularly challenging charge" of answering the question "what would have happened?" had his jury panel been properly selected. *Ambrose*, 684 F.3d at 652. Ambrose must then satisfy the three requirements outlined in *Duren* to succeed on his fair cross-section claim.[2]

---

[2] As will be explained, *Duren* requires the following three elements to demonstrate a fair cross-section claim: "(1) that the group alleged to have been excluded is a 'distinctive' group in the community; (2) that the representation of that group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to the systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Had Ambrose received a proper jury venire, there is a reasonable probability that he would have been tried before a more diverse jury. And there is a reasonable probability that a more diverse jury would have been less likely to convict him. Accordingly, Ambrose's procedural default is excused and this Court may consider his fair cross-section claim, which has merit. As a result, the Court will—for the second time—conditionally grant his habeas petition.

## I

The first hurdle facing Ambrose—placed squarely before him by the Sixth Circuit—is demonstrating that being tried by a jury that was not drawn from a fair cross-section of the community actually prejudiced him. Until he can demonstrate actual prejudice, this Court is foreclosed from assessing his fair cross-section claim because it was procedurally defaulted.

The Sixth Circuit emphasized that, in determining whether Ambrose suffered actual prejudice because of the unconstitutional jury venire, "[t]he most important aspect to the inquiry is the strength of the case against the defendant." *Id*. Accordingly, the Court will detail the facts of Ambrose's underlying convictions.

## A

Ambrose was accused of robbing two men—Spencer Anderson (Anderson) and Lee Morgan (Morgan)—in Grand Rapids, Michigan, on May 19, 2000. At a preliminary hearing conducted on September 28, 2000, Anderson established that he met Ambrose a year before the robbery at their mutual friend Tashon Suggs's house, and that he had seen Ambrose at that location numerous times. Prelim. Hr'g Tr. 13, ECF No. 20. Further, Anderson indicated that Morgan and Ambrose had gone to "school together," so Morgan knew Ambrose as well. *Id*.

Concerning the robbery itself, Anderson testified that he was driving with Morgan (who is his cousin) to the store around 2:00 p.m. on May 19, 2000. *Id*. at 6. According to Anderson, Ambrose (who he knew as "PeeWee") flagged them down as they traveled along Franklin Avenue, "[a]cross from the Social Service Building." *Id*. at 7. Anderson pulled over, picked up Ambrose and another man[3] that he did not know, and proceeded to take Ambrose "where he was going." *Id*. at 8. Anderson drove down Franklin, "turn[ed] right on Morris . . . then turn[ed] left on Thomas," and finally, "turned into the alley[,]" Ambrose directing all the way. *Id*. at 8.

Anderson testified that after they entered the alley, Ambrose "pulled out a rifle, a little gun" and told Anderson that "he got to have everything." *Id*. at 8. Anderson claimed that he gave Ambrose "[a] hundred dollars," handing the money to Ambrose "personally," but not anything else. *Id*. at 9. He also testified that Morgan handed over "[h]is necklace." *Id*. Then Ambrose ordered Anderson and Morgan out of the car, and they complied. The man with Ambrose "grabbed [Anderson's] necklace" before he and Ambrose made their escape. *Id*. at 10. Anderson made clear that the "$100 in cash" and the necklace were all that "came off of [his] person." *Id*. at 16.

Morgan took the stand after Anderson during the preliminary hearing. Unlike Anderson, he indicated that the day of the robbery the two men were "driving around, really just driving," saying nothing about a trip to the store. *Id*. at 18. Indeed, on cross examination, Morgan clarified that he and Anderson were "[j]ust riding around really. No—no destination, really." *Id*. at 26. Morgan confirmed that he had seen Ambrose "on a fairly regular basis" while the two of them attended the Youth Career Development Center. *Id*. at 19–20.

After the preliminary hearing, Ambrose was bound over on two counts of armed robbery, one count of carjacking, and one count of felony-firearm possession. *Id*. at 37–39.

---

[3] This man was identified at trial as "Rickie Hicks." Trial Tr. vol. I, at 4, ECF No. 19.

**B**

Ambrose's trial proceedings began on April 16, 2001, and lasted through April 19, 2001. The first day—conducted before a jury was even selected—was directed solely to the circumstances of a homicide that occurred on May 29, 2000, ten days after the alleged robbery of Anderson and Morgan. The prosecutor originally sought to introduce evidence concerning the homicide during Ambrose's trial under Federal Rule of Evidence 404(b). Accordingly, the court examined the evidence so that it could later determine whether the May 29, 2000 homicide was sufficiently similar to the May 19, 2000 robbery to allow for the admission of evidence related to the homicide under Rule 404(b). However, after completing his case in chief, the prosecutor elected to "withdraw" his application for the introduction of the Rule 404(b) evidence, which the court readily allowed. *See* Trial Tr. vol. IV, at 66–67, ECF No. 16. Because the evidence did not play a role in Ambrose's trial, and was not considered by the jury, it will not be described here. During the second day, April 17, 2001, a jury was selected.[4]

**C**

The third day of trial began with opening statements. The State summarized the evidence as it was presented during the preliminary hearing: Anderson and Morgan were driving around "doing a number of chores" when they came across Ambrose, who asked for a ride. Trial Tr. vol. III, at 14, ECF No. 17. Anderson and Morgan picked up Ambrose, along with his friend Rickie Hicks, and Ambrose directed Anderson to drive into an alley. According to the prosecutor, Ambrose and Hicks then robbed Anderson and Morgan at gunpoint and made off with cash, jewelry, and the 1992 Ford Taurus Anderson was driving.

---

[4] This case centers on the jury venire from which Ambrose's petit jury was selected, not on the actual petit jury itself. Accordingly, the selection of Ambrose's petit jury is not germane to the questions presented here and will not be described.

Counsel for Ambrose painted a different picture.  He asserted that Morgan and Anderson were "the only two individuals who were there" during the incident, but that "their story ha[d] changed" from the first time they talked to the police.  *Id*. at 25.  Ambrose's counsel also indicated that there were "significant discrepancies" between Anderson's and Morgan's accounts of the robbery.  *Id*.

After opening statements concluded, the State called Gregory Griffin, a Detective with the Grand Rapids Police Department, as a witness.  *Id*. at 28.  But Detective Griffin did little more than set the scene; he established the locations involved in the case and testified that the vehicle Ambrose allegedly stole from Anderson and Morgan was recovered in an area behind a residence in which Ambrose previously lived.  *Id*. at 42.

**1**

Then Anderson testified.  He explained that on the day of the incident, he decided to go to his "cousin Corey's house" which was "[n]ot even a block" from where he lived with his mother.  *Id*. at 61, 62.  Despite the proximity of the two residences, Anderson drove a car.  He had access to his own car and his mother's 1992 Ford Taurus, but he decided to take his mother's car instead of his own (which was available and operable), "[b]ecause—well, [his] car was in the driveway and hers was on the street.  So, when [he] got up, [he] had just took her car."  *Id*. at 45, 51.  Anderson testified that he drove to Corey's house and Morgan was already there.  *Id*. at 62.

Anderson indicated that he and Morgan decided to go "get something to eat," so they got in his mom's car and drove to Food Town—only three blocks away.  *Id*.  After getting something to eat, Anderson and Morgan decided to go to Ms. Tracey's, a party store.  *Id*.  Anderson claimed that there was "no particular reason" for the trip.  *Id*.

After leaving Food Town and driving for what he estimated was "20 minutes," Anderson claimed Ambrose (again, who he referred to as PeeWee) "flagged" him down. *Id*. at 47. Although Ambrose was with "another kid" that Anderson did not know, Anderson was not concerned. *Id*. at 48, 49. He circled the block and stopped; Ambrose asked for a ride and Anderson agreed. *Id*. at 49.

Anderson was under oath when he testified during the September 28, 2000 preliminary hearing. On that date, he unequivocally indicated that he had seen Ambrose at a mutual friend's house on more than one occasion; in fact, he testified that is where he originally met Ambrose: "[Ambrose] knows a friend of mine, and they used to always hang out at his house. That's whern [sic] I met him at first." Prelim. Hr'g Tr. 12. During the trial, however, Anderson indicated that he and Ambrose had no mutual friends and had never visited the same location, only that he had "seen [Ambrose] around." Trial Tr. vol. III, at 49.

Regardless of how well Anderson knew Ambrose, he invited Ambrose and the unknown man to get into the backseat of his mother's Ford Taurus. *Id*. Ambrose then directed Anderson to his intended destination—unknown to Anderson at the time—and Anderson complied. *Id*. at 50. Anderson testified that after they had traveled "two blocks, maybe three," Ambrose "was telling [him] that [Ambrose] had a gun."[5] *Id*. Anderson claims that Ambrose then directed him into an alley, "pull[ed] out a gun," and said, "Hand us everything." *Id*. at 51.

According to Anderson, he turned around and Ambrose was pointing "a machine gun" at him. *Id*. at 52. Anderson claimed that the weapon was "completely out and visible[,]" that Ambrose had his "arm extended pointing [the gun] toward [Anderson,]" and that the weapon was between 12 and 14 inches long. *Id*. at 66. Anderson testified that after he saw Ambrose's gun,

---

[5] Although Anderson first claimed that Ambrose said he had a gun, *see* Trial Tr. vol. III, at 49, he later testified during cross examination that Ambrose did not ever say, aloud, that he had a gun, *see id*. at 65.

he looked at Morgan with a "What's going on here?" expression and stopped the car in the middle of the alley. *Id*. at 53. Ambrose asked for Anderson's wallet, which Anderson claimed had $100 cash in it. *Id*. at 54. So Anderson held up his wallet, and the previously unknown man assisting Ambrose—who Anderson identified as Rickie Hicks (Hicks)—collected it while Ambrose held the machine gun. *Id*.

Anderson testified that Ambrose—gun in hand—ordered him and Morgan out of the car and that they immediately complied. *Id*. Notably, Anderson indicated that he "got out first" and that "once [Morgan] seen that I was exiting the car, he got out." *Id*. at 69. According to Anderson, Hicks then got out of the backseat, grabbed two necklaces from around Anderson's neck, and got "in the front seat in the driver's side seat . . . ." *Id*. at 55. Of course, Anderson claimed Hicks also grabbed a gold necklace from around Morgan's neck as Morgan was getting out of the car. Then Hicks and Ambrose made off with the loot (the cash, necklaces, and the car). *Id*.

After Ambrose and Hicks drove away, Anderson and Morgan "ran to Mrs. Guyton's house." *Id*. at 56. Mrs. Guyton goes to church with Anderson's mother, and he testified that she was "a real close family friend . . . ." *Id*. Anderson used Mrs. Guyton's phone to call the police, and then he left and went home. *Id*. Police officers then made contact with Anderson at his home about a "half hour" after the incident occurred. *Id*. Anderson claimed he did not stay at Mrs. Guyton's house because "she's elderly and [he] didn't want her to get involved in this." *Id*. at 70.

Anderson was called in to the Grand Rapids Police Department on May 22, 2000. *Id*. at 58. He told the police he had been robbed by "PeeWee" and identified Ambrose from a photo

array.  *Id*. at 59.  Approximately two weeks later, Anderson identified Hicks during a lineup in the county jail.  *Id*.

Notably, during cross examination, Ambrose's attorney asked Anderson if he was aware of what a "drug rental" was.  *See id*. at 72.  Counsel explained that a drug rental involves one person loaning their car to another person in exchange for drugs.  *Id*.  Anderson denied ever having heard of such a practice, and emphasized that such an exchange is not why Ambrose had his mother's car (as opposed to an armed robbery and carjacking).  *Id*.

### 2

Morgan took the stand directly after Anderson and gave his account of May 19, 2000.  Contrary to what Anderson said—but consistent with his preliminary examination testimony—Morgan testified that he and Anderson had no destination in mind while driving around prior to encountering Ambrose: "It was like a sunny day outside, so we had really no destination."  *Id*. at 77.  According to Morgan, and again contrary to Anderson's testimony, the two men had been driving around for up to an hour before Ambrose flagged them down.  *Id*. at 90.  While Anderson claimed that he and Morgan stopped for some food, Morgan testified that the two did not stop anywhere:

> Q:     During the time you left your cousin's house until you were flagged down
>        by PeeWee, did you and Spencer [(Anderson)] stop anywhere?
>
> A:     No, sir.
>
> Q:     You're sure of that?
>
> A:     Yes, sir.

*Id*. at 90–91.

Morgan related that he and Anderson were cruising around until he heard "PeeWee"—Ambrose—"scream, 'Hey, Spencer,' or something like that."  *Id*. at 78.  Morgan indicated that

"at first [he] like waved, but then [he] had told Spencer that [Ambrose] was calling him." *Id*. at 79. Then, just as Anderson described, Morgan claimed they circled the block and stopped for Ambrose. Morgan said Ambrose asked for a ride "to a store or something like that" and then got into the backseat with "Rickie Hicks" (whom Morgan did not know at the time). *Id*. Although he did not know Hicks, Morgan "knew who [Ambrose] was." *Id*. at 80.

According to Morgan, Ambrose directed Anderson to drive into an alley, and then Morgan could hear noises "[l]ike metal something." *Id*. at 81. Morgan represented that Ambrose then said, "Give me everything I need, all of that." *Id*. Morgan claimed Anderson attempted to "plead" with Ambrose, saying "Oh, no. We better than that. Like, we supposed to be like close or whatever." *Id*. But, according to Morgan, Ambrose simply responded, "I need everything." *Id*. Although Anderson claimed Ambrose's gun was over a foot long, Morgan never saw it:

> Q:    Did you actually see [Ambrose] aim the automatic weapon at you?
>
> A:    No. Spencer seen it. I never saw it. From where he was located behind me, I heard the noises and kind of assumed it was a gun.

*Id*. at 82.

Morgan testified that, at Ambrose's direction, Hicks checked the two victims for valuables. According to Morgan, Hicks took Anderson's wallet and chains, and his chain, before driving off. Unlike Anderson, however, Morgan testified that *he* got out of the car first after he and Anderson were ordered out: "[Ambrose] orders us to get out the car. He orders us to step out the car and I step out first. And, while I'm stepping out in front and looking like over to Spencer to make sure he don't end up shot or something, because he kind of took longer than me to get out the car." *Id*. at 83. Indeed, Morgan was "sure" he exited the car before Anderson. *Id*. at 96–

97.  Like Anderson, Morgan testified that Hicks then got in the driver's seat while Ambrose remained in the back, and the two men drove away.  *Id*. at 83.

Morgan recalled that he and Anderson then ran to Mrs. Guyton's to call the police, but Morgan's and Anderson's accounts of the subsequent events differ yet again.  While Anderson testified that he went back to his house alone, Morgan claims to have gone with Anderson "and then that's when the police arrived and took the report."  *Id*. at 84.

During cross examination, Ambrose's counsel also asked Morgan if he knew what a "drug rental" was, and once again Morgan's testimony differed dramatically from Anderson's:

Q:    Do you know what a drug rental is?

A:    Yes, sir.

Q:    What is that?

A:    A drug rental?

Q:    A drug rental, yeah.

A:    Well, my—you probably give drugs to get something from somebody or–

Q:    Okay.

A:    –somebody give you drugs to get something from you.

Q:    And certainly you've heard or understand that sometimes people will allow somebody to use their vehicle for a short period of times [sic] so they can get some drugs?

A:    Yeah, but that didn't happen in this case, sir.

Q:    Okay.  But that is what—that's at least part of what a drug rental is, would you agree?

A:    Yes, sir.

Q:    Okay.  Does Spencer know what that is, do you know?

A:    He should.

- 11 -

*Id*. at 91.

<div align="center">

**3**

</div>

Morgan and Anderson were the only two witnesses who possessed first-hand knowledge of the events in the alleyway with Ambrose and Hicks. Indeed, Morgan and Anderson were the only two witnesses who claimed anything *did* happen in that alley.

After Morgan testified, the State called Mary Jane Williamson, an employee with the Grand Rapids Public Schools. *Id*. at 112. She simply established that Ambrose and Morgan went to Youth Development School together and were in the same class during the 1996–97 school year. *Id*. at 120. In fact, Ambrose's attorney had "no questions" for Ms. Williamson. *Id*. at 121.

The State next called Carol Stahl as a witness, an Officer with the Grand Rapids Police Department. *Id*. at 122. Officer Stahl spoke with both Anderson and Morgan after the incident, at approximately 2:30 p.m. *Id*. at 124. She established that Anderson and Morgan said one of the suspects was Ambrose, who they referred to as "PeeWee." *Id*. at 125. According to Officer Stahl's memory, both Anderson and Morgan told her that after the robbery, Ambrose "got in the passenger side front" of the car before Hicks drove away. 135–36. She documented the statement in her report. *Id*. at 136.

Officer Stahl indicated in her report that she was unable to locate the alley Anderson and Morgan claimed to have been robbed in, although she "had them try and locate the location . . . on the map." *Id*. at 134. She also testified that either Morgan or Anderson represented that a phone was taken during the robbery. *Id*. at 136.

After Officer Stahl, the State called Harvey Barker, another Officer with the Grand Rapids Police Department. *Id*. at 141. Officer Barker found the Ford Taurus that Anderson was

driving just after 12:00 a.m. the morning of May 20, 2000. *Id*. at 141–42. He recalls finding a cellphone in the vehicle, along with a cellphone cord, and Anderson's wallet and I.D. *Id*. at 143. Officer Barker also found a gold ring, a silver ring, and a watch on the seats in the vehicle. *Id*. at 144. At least the silver ring was in plain view. *Id*. at 155. Aside from describing how he contacted crime scene technicians to examine the car, Officer Barker had little else to add.

### D

The fourth—and final—day of Ambrose's trial began with the State calling Dean Garrison as a witness. Mr. Garrison is employed by the Grand Rapids Police Department as a crime scene technician in the Forensic Services Unit. Trial Tr. vol. IV, at 5. On May 20, 2000, he was called to the location of the allegedly stolen Ford Taurus to "fingerprint" and "examine" the vehicle. *Id*. Mr. Garrison recalled seeing a "necklace . . . in the driver's seat area somewhere." *Id*. at 6. Mr. Garrison also laid the foundation for the introduction of a fingerprint that he was able to lift from the car. *Id*. at 6–7.

The State then called William Wolz, a latent print examiner with the Grand Rapids Police Department. *Id*. at 18. Mr. Wolz's position basically entails "tak[ing] the fingerprints that are collected at crime scenes and compar[ing] them under a magnifying glass to known prints [to] hopefully make a match." *Id*. at 19. Mr. Wolz examined the print collected by Mr. Garrison, but it was "not usable." *Id*. at 22. Why Mr. Garrison's and Mr. Wolz's testimony was offered is unclear, other than possibly to demonstrate to the jury that the government had attempted— unsuccessfully—to recover and identify fingerprints located on the 1992 Ford Taurus.

The third witness called on the last day of trial was Lena Guyton, the woman who allowed Anderson and Morgan to use her telephone to call the police. Ms. Guyton testified that Anderson and Morgan came to her house and asked to use her phone. *Id*. at 32. She agreed, but

"didn't hear who [Anderson] called. [She] didn't try to listen . . . but [she knows Anderson] said he was gonna call the police and [she knows] that later on the police did come but [Anderson] had left." *Id*. After no questions were asked on cross examination, Ms. Guyton was excused.

The State also called Anderson's mother, Doris Littles, to testify in the case. Ms. Littles was working the day of the incident, and she could not remember if she "called home" or if she got "a message at work to call home," but for whatever reason she did call, talked to Anderson, and he informed her that "somebody had took the car and that he had just got through talking to the police officers." *Id*. at 37. Ms. Littles testified that when she recovered the car she was "just really . . . surprised it wasn't all tore up or anything." *Id*. According to Ms. Littles, the "only" thing that was "out of the ordinary" with the car was what the police themselves did while examining it. *Id*. at 38.

The phone found in the car was not Ms. Littles. *Id*. She did not "know anything" about the silver and gold rings found in the car. *Id*. Finally, she did not know anything about "a chain or necklace that was found" in the car. *Id*. at 39. Ms. Littles was then excused.

The State then recalled Anderson. He established that the phone recovered in the car was his, *id*. at 41, but that he never got a chance to examine the rings or the watch or the necklace that were found to determine "whether they belong[ed] to [his] sisters or to anybody[,]" *id*. at 43. The State also recalled Detective Griffin. He indicated that "Mr. Anderson came into the police department and [Detective Griffin] conducted an interview with him. [Anderson] provided a nickname of Pee Wee and gave the location of where he believed Pee Wee to live." *Id*. at 44. On cross examination, Ambrose's counsel established that Detective Griffin never attempted to discuss with Anderson the rings, watch, and necklace discovered in his mother's car. *Id*. at 56– 57.

After Detective Griffin finished testifying for the second time, the State rested its case in chief. *Id.* at 67. The defense did not attempt to offer any evidence and also rested. *Id.* at 69. Counsel then moved into closing arguments. The State asserted, as it had throughout the case, that the evidence supported the charges—that Ambrose had robbed Anderson and Morgan at gunpoint and then taken Anderson's car. The defense, on the other hand, emphasized the differences between Morgan's and Anderson's testimony and suggested that this had been a "drug rental" gone awry. *Id.* at 81–84. Counsel said that "[w]hatever Mr. Anderson and Mr. Morgan were up to that day, at some point they became separated from the car and [Anderson] knew he had to account to his mother for what happened to that car and this is the story they came up with." *Id.* at 91.

### E

At the conclusion of the trial, the jury convicted Ambrose on two counts of armed robbery, one count of carjacking, and one count of felony-firearm possession. On June 19, 2001, he was sentenced to two years' imprisonment "[o]n the charge of possession of a firearm in the commission of a felony"; ten to fifty years on the carjacking charge, to run consecutive to the two years for felony firearm; and fifteen to sixty years on each of the armed robbery charges, to "run concurrent with the carjacking sentence and consecutive" to the two years for felony-firearm possession. Sent. Tr. 6, ECF No. 15.

Ambrose sought leave to appeal his convictions and sentence; however, his appointed counsel withdrew and the Michigan Court of Appeals determined that any appeal would be frivolous. *Ambrose*, 684 F.3d at 640. Ambrose did not appeal to the Michigan Supreme Court. *Id.*

- 15 -

**II**

The unusual event that is the basis of Ambrose's habeas petition has been well documented, both by this Court and by the Sixth Circuit.  *See Ambrose v. Booker*, 781 F. Supp. 2d 532, 537–40 (E.D. Mich. 2011); *Ambrose*, 684 F.3d at 640–43.  So only a general explanation will be set forth here.

On July 30, 2002, the Grand Rapids Press reported that a computer glitch had impacted Kent County's system for selecting jury venires.  *Id*. at 640.  The problem was noticed in 2002 when a local high school teacher, Wayne Bentley, completed a study of minority representation on Kent County juries.  *Id*. at 641.  Kent County subsequently conducted an internal study that revealed that "nearly 75 percent of the county's 454,000 eligible residents were excluded from potential jury pools since spring 2001" and that "[m]any blacks were excluded from . . . jury pools due to a computer glitch that selected a majority of potential candidates from the suburbs." *Id*.  "The chief judge of the Kent County Circuit Court, George Buth, stated, 'There has been a mistake—a big mistake.'" *Id*.

In light of these discoveries, Ambrose initiated post-conviction proceedings in Michigan state court claiming that he was denied his right to be tried by a jury drawn from a fair cross-section of the community and requesting relief from his judgment and sentence.  *Id*.  The Michigan trial court denied relief because, among other things, Ambrose did not object to the venire before his jury was empanelled.  *Id*.  The Michigan Court of Appeals denied leave to appeal, as did the Michigan Supreme Court.  *See People v. Ambrose*, 706 N.W.2d 16 (Mich. 2005).

Ambrose then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. As indicated previously, because he did not raise a contemporaneous objection to his jury venire

- 16 -

at trial, Ambrose was required to demonstrate cause and actual prejudice to excuse his procedural default.  This Court concluded that Ambrose had shown good cause to excuse his failure to object "because he could not have known of the [computer] glitch."  *Ambrose*, 684 F.3d at 643.  The Court also found that the number of African Americans in Ambrose's jury pool was not "fair and reasonable in relation to the number of such persons in the community."  *Id.* (citation omitted).  The Court considered the error to be structural so prejudice was presumed, as structural errors "defy analysis by 'harmless-error' standards because they affect the framework within which the trial proceeds, and are not simply an error in the trial process itself."  *Ambrose*, 781 F. Supp. 2d at 541–42 (citations omitted).

Upon review, the Sixth Circuit agreed that Ambrose had demonstrated sufficient cause to excuse his "failure to object."  *Ambrose*, 684 F.3d at 649.  The Sixth Circuit did not agree, however, that the unconstitutional jury venire—a structural error—necessitated a presumption of prejudice.  The court noted, on the contrary, that the Sixth Circuit has "declined to presume prejudice for the purposes of procedural default when considering structural error claims," although the issue had yet to be addressed "in the context of a fair cross-section claim."  *Id.* Instead of presuming prejudice, the court expressly concluded that "a petitioner must show that he was actually prejudiced *regardless of the nature of the underlying constitutional claim.*"[6]  *Id.* (emphasis added).

---

[6] This Court notes that the Sixth Circuit's holding contrasts with numerous decisions by the Supreme Court and the Circuit Courts of Appeals, including a recent published opinion from the Sixth Circuit.  *See, e.g.*, *Hereford v. Warren*, 536 F.3d 523, 528 (6th Cir. 2008) ("Automatic reversal is required . . . if the error was a 'structural defect' that permeated '[t]he entire conduct of trial from beginning to end' or 'affect[ed] the framework within which the trial proceeds.'"); *Owens v. United States*, 483 F.3d 48, 64 (1st Cir. 2007) ("it is impossible to determine whether a structural error is prejudicial"); *United States v. Rodriguez*, 406 F.3d 1261, 1263 (11th Cir. 2005) ("structural error approach precludes application of th[e] harmless error doctrine."); *United States v. Yakobowicz*, 427 F.3d 144, 153 (2d Cir. 2005) (structural defects require reversal because they "affect [ ] the framework within which the trial proceeds."); *United States v. Gonzalez-Lopez*, 399 F.3d 924, 932 (8th Cir. 2005) (same); *Lewis v. Pinchak*, 348 F.3d 355, 358 (3d Cir. 2003) ("structural error requir[es] reversal, per se"); *United States v. Curbelo*, 343 F.3d 273, 278 (4th Cir. 2003) ("structural defects in the constitution of the trial mechanism . . . defy analysis by 'harmless-error'

Accordingly, the Sixth Circuit presented Ambrose a daunting challenge.  To excuse his failure to object to the unconstitutional jury venire at trial—by demonstrating actual prejudice—he must satisfy the "particularly challenging charge" of answering the question "what would have happened?" had he been tried before a properly selected jury.  *Id.* at 652.  Specifically, Ambrose must demonstrate "a reasonable probability that a properly selected jury would have been less likely to convict."  *Id.* (brackets, internal quotation marks, and citation omitted).  The Sixth Circuit directed that this Court decide the issue "with a careful look at the transcripts involved" because "[t]he most important aspect to the inquiry is the strength of the case against the defendant."  *Id.*  In a corresponding footnote, however, the court went on to note that race is not irrelevant: "This is not to say that the race of the jurors, defendant, and victim must be ignored."  *Id.* at 652 n.4.

---

standards because they are 'necessarily unquantifiable and indeterminate.'"); *United States v. Walters*, 309 F.3d 589, 593 (9th Cir. 2002) (defining "structural errors" as those that "defy analysis by 'harmless error' standards."); *United States v. Harbin*, 250 F.3d 532, 543–44 (7th Cir. 2001) (establishing that structural errors "are conclusively presumed to be prejudicial."); *United States v. Pearson*, 203 F.3d 1243, 1260 (10th Cir. 2000) (noting that structural errors are defects that defy harmless-error analysis); *Pyles v. Johnson*, 136 F.3d 986, 993 (5th Cir. 1998) (same); *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993) (establishing that "structural defects in the constitution of the trial mechanism" necessarily "defy analysis by 'harmless-error' standards"); *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993) (same); *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (same); *Vasquez v. Hillery*, 474 U.S. 254, 261, 263 (1986) (indicating "a harmless-error standard" does not apply to structural errors and that "[w]hen constitutional errors call into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm. . . . and we must presume that the process was impaired.").  Indeed, as the Supreme Court clarified in *Peters v. Kiff*, 407 U.S. 493 (1972), while addressing a situation where African Americans had been systematically excluded from participating in grand juries:

> When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. . . . It is in the nature of the practices here challenged that proof of actual harm, or lack of harm, is virtually impossible to adduce.  *For there is no way to determine what jury would have been selected under a constitutionally valid system, or how that jury would have decided the case.*

*Id.* at 503–04 (emphasis added).  Regardless, the Sixth Circuit's published decision in *Ambrose* is the law of the case.  *See Valentine v. Francis*, 270 F.3d 1032, 1035 (6th Cir. 2001).

### III

With this guidance, the Court endeavored to determine whether a properly selected jury—one drawn from a fair cross-section of Ambrose's community—would have been less likely to convict him than the jury actually empanelled. If this is the case, actual prejudice exists such that Ambrose's procedural default must be excused. The Court will then address his fair cross-section claim. If Ambrose fails to demonstrate actual prejudice, because a jury drawn from a fair cross-section of the community would not be less likely to convict him, his default will not be excused and his habeas petition must be denied.

### A

The parties were first directed to file supplemental briefs addressing whether Ambrose can demonstrate that a properly-selected jury would have been less likely to convict him. *See* June 3, 2013 Order 2, ECF No. 83. Ambrose filed his first supplemental brief on June 20, 2013. *See* Pet'r's First Supp. Br., ECF No. 84. He argues that he "can easily establish a 'reasonable probability' that a more diverse jury would have been 'less likely to convict'" for two reasons: (1) "African-Americans are 'less likely to convict'"; and (2) "this case involved evidence and a defense theory that depended heavily on the jury's ability to understand and appreciate the sometimes unlikely ways in which inner city drug crimes take place." *Id*. at 3. Relying primarily on the former argument, Ambrose contends that "reliable empirical evidence demonstrates that African Americans are 'less likely to convict' as a categorical matter, and that the Sixth Circuit's 'actual prejudice' standard is therefore satisfied in every single case." *Id*. at 5–6.

To substantiate this claim, Ambrose offered the testimony of "Samuel Sommers, Ph.D., the nation's foremost expert in the fields that are inherently implicated by the Sixth Circuit's

standard: 'the influence of race on social perception and judgment,' 'the relationship between race and legal decision-making,' and 'the psychology of intergroup relations and racial bias.'" *Id*. at 6. According to Ambrose, Dr. Sommers concluded that "[e]mpirical analysis of actual juries has demonstrated that increasing the number of African American jurors on a jury creates a reasonable and statistically significant probability that a jury would be less likely to convict." *Id*. (citation omitted).

The State responded to Ambrose's first supplemental brief by filing its own first supplemental brief on July 11, 2013. Resp't's First Supp. Br., ECF No. 85. The State described the applicable legal landscape, and then argued that "the evidence against Ambrose was very strong[,]" so much so that Ambrose "cannot demonstrate . . . that a reasonable probability exists that a properly selected jury would have been less likely to convict." *Id*. at 14. The State also represents that "there was absolutely no evidence presented at trial supporting a defense that no robbery occurred and that the victim gave his car to Ambrose to satisfy a drug debt." *Id*. at 15. Thus, according to the State, "[i]f there was no evidence that such a drug rental occurred here, it would make no difference to a jury familiar with such a concept [rather] than a jury that was not." *Id*. Further, the State indicates that the jury's determination as to the witnesses' credibility is controlling, and that the "jury in this case spoke loud and clear through its verdict—it found the victims to be credible and did not believe that Anderson gave the car to Ambrose as a 'drug rental.'" *Id*. at 16.

The State also takes issue with Dr. Sommers and his conclusions. First, it argues that Dr. Sommers's affidavit should be rejected because "it is not a part of the record in this case." *Id*. at

18.  Moreover, the State asserts that Dr. Sommers's conclusions cannot be relied upon because they "conflict with the Sixth Circuit's decision in this case."  *Id*. at 22.[7]

**B**

The Court conducted an evidentiary hearing on September 16, 2013, during which Ambrose called Dr. Sommers as an expert witness.[8]  Dr. Sommers essentially testified that a more diverse jury would have been less likely to convict Ambrose because African-American jurors are statistically less likely to convict than their Caucasian counterparts.

Dr. Sommers is an Associate Professor of Psychology at Tufts University in Massachusetts.  Sept. 16, 2013 Hr'g Tr. 16, ECF No. 92.  He explained that, among other things, his research focuses on how race affects the decisions people make: "I'm a Social Psychologist and my particular research area involves interracial perception and interaction and judgment and decision making.  So how people make decisions, have conversations, see the world around them and how those processes are influenced by questions related to race and other demographics."  *Id*. at 16–17.  Specifically, Dr. Sommers established that his particular area of expertise involves the interaction between race, decision-making, and the legal system:

> I have a particular interest and expertise in the legal system so studying how these issues play themselves out among jurors making decisions, attorneys during jury selection, eyewitness memory and so forth.  And so race and perception and judgment in the legal domain would be the short way to answer that.

---

[7] Ambrose filed a reply brief on July 19, 2013, which basically reiterates his arguments, which are outlined above.  *See* Pet'r's First Reply, ECF No. 87.

[8] Although the State indicates that Dr. Sommers "was never actually qualified as an expert at the evidentiary hearing," Resp't's Second Supp. Br. 25, during the September 16, 2013 hearing the State raised no objections to Dr. Sommers's testimony or any of his opinions.  Moreover, under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), to be considered, Dr. Sommers's testimony must be (1) supported by scientifically valid reasoning (2) which can be applied to the facts at issue to aid the fact-finder.  *See Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009) (citation omitted).  Of course, the "gatekeeper" doctrine envisioned by *Daubert* "was designed to protect juries and is largely irrelevant in the context of a bench trial" or an evidentiary hearing.  *Deal v. Hamilton Cnty Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004).  And even if the *Daubert* factors were considered here, Dr. Sommers's testimony would meet the threshold for admissibility.  He is a nationally recognized expert relying upon peer-reviewed studies, and his testimony can be applied to the facts at issue in this case and will aid the Court in determining whether a properly selected jury would have been less likely to convict Ambrose.

*Id.* at 17.  As a result of his interest in how race affects juries and their decisions, Dr. Sommers has "published a dozen—a couple dozen studies on issues related to race and jury decision making, race and jury selection, race and jury deliberations, as well as more general investigations of diversity and how diversity influences groups and group processes."  *Id.*

Dr. Sommers testified that he was familiar with the Sixth Circuit's decision in *Ambrose v. Booker*, and further, that he understood Ambrose was tasked with demonstrating "a reasonable probability that the jury in this case would have been less likely to convict had it been more diverse."  *Id.* at 18–19.  Dr. Sommers expressed his opinion that the question Ambrose now confronts is "the sort of question . . . social science can assist courts with understanding."  *Id.* at 19.  Dr. Sommers then concluded that—based on his expertise, the "relevant literature," and other empirical studies—a "more diverse" jury would have been "less likely to convict" Joseph Ambrose.  *Id.*

**1**

Dr. Sommers described the body of research that informed his opinions.  He explained that the research studies he was relying on "involve analyses of real juries that have rendered decisions in actual cases" and "controlled experiments involving mock juries."  *Id.*  His conclusions were further "informed by the more general research literature on how diverse settings affect the way people—the groups function and that people make decisions."  *Id.* at 19–20.

Although Dr. Sommers acknowledged that mock juries and real juries are very different, he indicated that "approach[ing] any question from multiple research perspectives" is ideal because "if you use multiple research designs and produce converging findings from those

multiple research designs, you're even more confident at that point in the reliability of the conclusions you're drawing." *Id*. at 20.

Dr. Sommers went on to testify that the research studies he was relying upon "are peer-reviewed research studies." *Id*. at 21. He explained that "social scientists[] give greater credibility to articles that have been peer-reviewed[,]" and also outlined what the peer-review process entails:

> So a peer-review process is one by which articles are, submissions—manuscripts submitted for publication are sent out to reviewers in the field who write reviews of the paper, recommendations to the editor, as to whether to accept them or not. And so articles that are published in peer-reviewed journals go through that process. Often, multiple iterations of that process, often ending in negative outcomes for the papers but to be published, a paper will go through at least one round if not more rounds of reviews before the experts who are reviewing it recommends to the editor that it be accepted for publication in that journal.

*Id*. at 22.

## 2

After establishing that the articles he was "relying most heavily on in [his] analysis" were peer-reviewed studies, *id*. at 21, Dr. Sommers testified specifically about three of those articles. The first was "the Williams and Burek study." *Id*. at 22. Dr. Sommers indicated that the Williams and Burek study (W&B Study) is "a study in which the researchers examined a series of actual trials from multiple jurisdictions and looked at the extent to which the percentage of White jurors on the jury predicted the outcome of the trials, predicted jury verdicts in those cases." *Id*. at 22–23. According to Dr. Sommers, the researchers found that "the greater the percentage of White jurors on those juries, the more likely the jury was to convict," even when "controlling for a variety of other factors that might influence the processes as well, factors including the location of the trial, the type of attorney, the strength of the evidence, and so

forth."[9]  *Id*. at 23.  Dr. Sommers clarified that the W&B Study involved "actual juries" and "actual cases."  *Id*.

He then took the opportunity to explain one of the limitations of research studies addressing real-life juries.  Dr. Sommers explained that "the real world is messy and real jury decisions like other real world data, they are messy."  *Id*. at 23.  For this reason, attempting to "draw comparisons between these trials that have occurred in the real world" is difficult because "there could be alternate explanations" to account for a given result.  *Id*. at 23–24.  To ensure "that there are not alternate explanations that wholly account for . . . apparent disparity" between jury decisions, Dr. Sommers and other researchers "try to control for these dozens and dozens of variables that could be explaining or helping account for the effects that you're reporting in the outcome of the study."  *Id*. at 24.  However, Dr. Sommers indicated that while "it [is] challenging to take all these different trials and put them together and learn something about the cases," he believes that when the data is aggregated, "we learn a lot about the general tendencies that we can then apply to these kind of situations."  *Id*. at 24, 25.

Dr. Sommers next discussed "the Bowers Study."  He indicated that the Bowers Study "presents some original empirical data" and also "reviews a series of other research studies that have been done looking at questions related to juror race and juror racial composition."  *Id*. at 27.  The key finding from the Bowers Study, Dr. Sommers explained, was "that the greater percentage of White jurors on the jury, the more likely the jury was to convict."  *Id*.  This conclusion remained true regardless of the defendant's race.  *Id*. at 29.  The Bowers Study also concluded that "the greater the percentage of White jurors in capital trials, the more likely the

---

[9] Later, Dr. Sommers reiterated that the "key finding" from the W&B Study "is that the greater the percentage of white jurors on a jury, the more likely the jury was to convict and that effect remains statistically significant even when you control for factors like strength of evidence, the number of exhibits and witnesses that the prosecution introduced in the case, the type of attorney representing the defendant and so forth."  Sept. 16, 2013 Hr'g Tr. 26. Importantly, Dr. Sommers specifically noted that the W&B Study "accounted for the strength of evidence."  *Id*.

jury is to recommend a sentence of death." *Id*. at 28.  Like the W&B Study, the Bowers Study

involved real juries.  *Id*. at 29.

**3**

Dr. Sommers then discussed one additional study he was relying upon that involved

mock juries rather than real juries.  It was a 2006 study that he conducted (Sommers 2006 Study)

in Washtenaw County, Michigan.  During the experiment, jury-eligible citizens were divided

into two types of juries: "half of the mock juries were all White and half of the mock juries were

racially diverse . . . we used six-person mock juries and the racially diverse juries were four

White and two African-American jurors."  *Id*. at 30.  These mock juries watched "the same trial

video . . . of an African-American defendant in a sexual assault case.  They all watched the exact

same trial."  *Id*.  Dr. Sommers videotaped jury deliberations and "compared the sort of personal

questionnaire judgments of the individual jurors" and also "looked at the different deliberations

of the racially diverse versus racially homogeneous juries discussing the exact same case."  *Id*.

Dr. Sommers summarized the key findings from the Sommers 2006 Study as follows:

"So we found in that study first that Black jurors in the study were less likely to vote to convict

the defendant than were White jurors so that's a finding consistent with what had been reported

in those studies of actual juries."  *Id*. at 32–33.

Dr. Sommers's 2006 Study also revealed—what he found to be the most interesting—that

"White jurors—behaved very differently in racially diverse jury settings than they did in all

White jury settings."  *Id*. at 33.  Dr. Sommers explained why he believes this is the case:

> I think the findings are consistent with other research in the literature that
> suggests that quite often in this day and age, among, at least many White
> individuals, you see a motivation to be fair, to try to avoid bias and to try to be as
> egalitarian as possible in making decisions like this.  And the results that we find
> in that study are, I think, consistent with that notion.

> And so if you were to run a study like that in a—with a different participant sample, whether a different part of the country or in a different time period, and you were to have a sample that didn't share that motivation, that was very comfortable with overt explicit racism, you'd probably find a different pattern of results.

*Id*. at 31. Dr. Sommers testified that "the White jurors who knew they were going to be in a racially diverse jury were less likely to think the defendant was guilty before the deliberations even began. Then the deliberations themselves . . . looked different." *Id*. Specifically, "the diverse juries raise a wider range of facts from the case in their deliberations. They make fewer factually incorrect statements regarding the facts from the case itself.[10] They are . . . more likely to discuss issues, controversial and uncontroversial issues related to race . . . ." *Id*.

In a nutshell, Dr. Sommers explained the effect mixed groups have on decision-making as follows:

> I mean, I think anyone who has ever used the phrase "in mixed company" understands what that means and often, it might refer to sex rather than race, but the idea that people might say or think or be concerned about different factors in a homogeneous setting versus a heterogeneous setting, the data seems to suggest that for the White—for White individuals, in this day and age, again, particularly people who are motivated to be egalitarian and to be fair-minded, that being in a diverse setting can be a sort of a red flag that reminds you to think about bias, to avoid bias, to make sure you're thinking things through carefully.

*Id*. at 34. As far as juries go, Dr. Sommers indicated that "the data tells us racial composition tends to predict jury outcomes." *Id*. at 32.

Dr. Sommers also discussed the possibility that a more diverse jury would have been more accepting of Ambrose's defense theory—the proposed drug rental:

---

[10] Dr. Sommers explained that judging the accuracy of juries is difficult "because it requires some sort of gold standard that we don't have," but in the Sommers 2006 Study he "created a checklist of the statements that came out during trial" and the juries were scored against that checklist. Sept. 16, 2013 Hr'g Tr. 36. The resulting scores included, among other things, how often the jury said "something factually incorrect about the case," or incorrectly recalled the testimony of one of the witnesses. *Id*. In the end, Dr. Sommers's research indicated that "there were more of those inaccurate statements made in the all-White juries than in the racially diverse juries." *Id*.

> Q:      And the concept of a drug rental which really was one of the sort of
>         leading themes of the trial . . . does your research shed any light on
>         whether . . . assuming that it came up in the jury room, whether a diverse
>         jury would have treated that topic differently than a White jury, a purely
>         White jury?
>
> A:      . . . What I can say is that the research literature indicates a general finding
>         that when you see a particular viewpoint or life experience or attitude on
>         an issue that seems to vary by demographic, that when you change the
>         demographic, that demographic on the jury, and make that demographic
>         more likely to be on that jury, you also increase the likelihood that that
>         perspective or viewpoint or life experience is shared during those
>         deliberations.

*Id.* at 48–49.

As he did with studies involving real juries, Dr. Sommers touched on some of the limitations inherent to mock-jury studies. He indicated that one of these limitations is that mock-jury studies have "less external validity than would a study of real juries where you know you're actually studying the juries and the jurisdiction you care about and the time frame you care about." *Id.* at 74. External validity—or how closely an experiment "compares to the real world"—is more limited in mock-jury studies than in live-jury studies. *Id.*

In the end, Dr. Sommers expressed his opinion—to a reasonable degree of scientific certainty—that a more diverse jury would have been less likely to convict Ambrose. *Id.* at 49 ("the data support the conclusion that a more diverse jury would have been less likely to convict.").

**4**

On cross examination, the State asked Dr. Sommers a variety of questions about a number of the research studies that he was relying upon and other studies that he had conducted. The State noted that the W&B Study "acknowledged the limitations of mock jury research" because "there are mixed results from mock jury research." *Id.* at 81. Sommers confirmed that

the difficulties raised by mock-jury studies include problems with "external validity and realism." *Id*.

The State asked Dr. Sommers to confirm that the W&B Study indicated that "Whites were slight—only slightly more likely to convict an African-American[,]" and Dr. Sommers replied, "Yes, slightly but statistically significantly . . . ." *Id*. at 83. Dr. Sommers also indicated he was aware "of an in-group/out-group mirror effect, if you will, with Black jurors being more lenient towards Black defendants and harsher towards White defendants and White jurors doing the reverse." *Id*. at 94.

Dr. Sommers did acknowledge that the "weight of the evidence may play the largest role in conviction decisions." *Id*. at 83–84. According to him, "the research is pretty clear on that point." *Id*. at 84. Nevertheless, Dr. Sommers maintained his opinion that although "region of the country, the type of attorney" and "[t]he strength of the evidence" all have an effect on the outcome of a trial, "controlling for those factors, the jury's racial composition has a small but statistically significant effect." *Id*.

The State questioned Dr. Sommers about giving jurors jury instructions as an attempt to cure racial bias. Dr. Sommers acknowledged that "instructing the jury that they should not let any biases prejudice them" can "affect" the biases they display; indeed, "in some of the studies" Dr. Sommers found that so instructing the jury eliminated "significant evidence of racial bias in White juries." *Id*. at 90. But Dr. Sommers countered that in the live-jury studies, "presumably those actual juries were given those instructions," and yet observable "disparities emerge[d]" anyway. *Id*. This phenomenon, according to Dr. Sommers, "might imply the instruction alone is not enough to completely eliminate [racial bias] effects . . . ." *Id*. at 90–91.

The State also raised an interesting point near the end of its cross examination of Dr. Sommers, indicating that "even supposing that an African-American juror would make a difference on any given case, that person would have to make it onto the petit jury." *Id*. at 92. Dr. Sommers agreed that it "seem[ed] like a fairly reasonable proposition." *Id*.  Dr. Sommers also indicated that because "African-American jurors like everybody else are a diverse group of people" with "[d]ifferent background experiences," "[d]ifferent education experiences," and "[d]ifferent social experiences," there is "no way" to offer a *certain*, *absolute* statement such as "any one person . . . would have made a difference on any particular case." *Id*. at 101.

## C

At the end of the September 16, 2013 evidentiary hearing, the Court directed the parties to file one additional round of supplemental briefing after a transcript of the hearing was available.  Ambrose filed his second supplemental brief on November 4, 2013.  He argues that Dr. Sommers's testimony is reliable and should be considered, and that it demonstrates that "more diverse juries are less likely to convict."  Pet'r's Second Supp. Br. 6, ECF No. 94.  But even if Dr. Sommers's testimony is not considered, Ambrose argues that "the prosecution's evidence is conflicted in several respects and was subject to productive cross-examination." *Id*. at 12.  Because Anderson's and Morgan's testimony "suggest[s] their dishonesty about whether or not they lent Mr. Ambrose their vehicle in exchange for drugs[,]" Ambrose reckons that "[t]here is at least a reasonable probability that a more diverse jury would have viewed their testimony with greater skepticism, and therefore been less likely to convict." *Id*.

The State filed its second supplemental brief on November 15, 2013.  It maintains that "[b]ecause the evidence against Ambrose was overwhelming," he cannot meet his burden of demonstrating "actual prejudice" to excuse his procedurally-defaulted fair cross-section claim.

Resp't's Second Supp. Br. 2, ECF No. 95. It also argues that "[t]his Court need not consider the testimony of Professor Samuel R. Sommers in assessing actual prejudice under the Sixth Circuit's opinion." *Id*.

Notably, the State also introduced a new argument, contending that even if Ambrose's jury venire had been properly selected, "as a matter of probability, the petit jury would have been identical." *Id*. at 23. This suggestion is initially premised on the statistical analysis of Dr. Edward Rothman, who found that the Kent County computer glitch only resulted "in a loss of one prospective African-American juror" out of a venire of 40 potentials. *Id*. at 23 n.6. The State goes on to argue that because each venire member "has only a 30% chance of being selected for a petit jury (12 slots for 40 prospective jurors)," the "the loss of one prospective juror in the venire would not likely affect the actual composition of the petit jury. In brief, it is more likely than not that the petit jury would have been identical." *Id*.

## IV

As previously indicated, before his fair cross-section claim can be addressed on the merits, Ambrose must demonstrate cause and actual prejudice to excuse his procedural default (failing to raise a contemporaneous objection to the unconstitutional jury venire). *See Ambrose*, 684 F.3d at 645, 649. The Sixth Circuit explained that Ambrose has already demonstrated cause such that his "failure to object must be excused." *Id*. at 649. Thus, to excuse his default entirely, Ambrose must demonstrate actual prejudice.

### A

As the Sixth Circuit framed the question, actual prejudice involves "determining whether there was a reasonable probability that a properly selected jury would have been less likely to convict" Ambrose. *Id*. at 652 (internal quotation marks, brackets, and citation omitted).

Although this prejudice standard is the precise standard utilized by the State, *see* Resp't's Second Supp. Br. 17 ("Ambrose cannot demonstrate that a reasonable probability exists that a properly selected jury would have been less likely to convict."), the State also argues that the prejudice standard outlined in *Strickland v. Washington*, 466 U.S. 668 (1984) should govern Ambrose's claims.   *See id*. at 694 (requiring petitioner to demonstrate that but for counsel's errors, "the result of the proceeding would have been different.").   So it appears that the State believes Ambrose must do more than demonstrate a reasonable probability that a properly selected jury would have been less likely to convict; rather, under *Strickland*, he would have to demonstrate a reasonable probability that—with a properly selected jury—"the result of the proceeding would have been different."

In another habeas case involving the Kent County computer glitch, *Garcia-Dorantes v. Warren*, No. 05-10172, 2013 WL 5566667 (E.D. Mich. Oct. 9, 2013), the court discussed the Sixth Circuit's prejudice requirement in a similar fashion, first indicating that a petitioner such as Ambrose must demonstrate "there is a reasonable probability that a different jury *would have reached a different result*[,]" but granting the habeas petition after concluding "that there is a reasonable probability that a fairly selected jury *would have been less likely to convict . . . .*"  *Id.* at *8 (emphasis added).

The discrepancy stems, in part, from the *Ambrose* opinion itself.   When describing the prejudice standard to be applied by this Court, and others facing the difficult question presented here, the Sixth Circuit cited to an Eleventh Circuit case involving a petitioner's claim "that his counsel was ineffective for failing to object to Alabama's systematic exclusion of African–American jurors from grand and petit juries."   *Ambrose*, 684 F.3d at 652 (citing *Hollis*, 941 F.2d at 1480).   The Sixth Circuit then explained that to excuse the default in *Hollis*, the Eleventh

Circuit required the petitioner to demonstrate "actual prejudice, which involved determining whether there was a reasonable probability that a properly selected jury would have been less likely to convict." *Ambrose*, 684 F.3d at 652 (internal quotation marks, brackets, and citation omitted). The court went on to indicate that "[a]lthough the instant petitions do not involve a *Strickland* claim, this standard is appropriate because it balances the competing demands of constitutionally protected equal protection interests and comity toward the state courts." *Id*. So when the Sixth Circuit referred to "this standard," did it mean *Strickland*'s standard for prejudice (a reasonable probability that a proper jury would change the result of Ambrose's trial), or the standard for prejudice the court lifted from *Hollis* (a reasonable probability that a proper jury would have been less likely to convict Ambrose)?

Contrary to the State's suggestion, the *Strickland* standard for prejudice does not apply here; Ambrose is not presenting a claim based on the ineffective assistance of counsel. So Ambrose need not demonstrate a reasonable probability that a properly selected jury would not have convicted him, he need only show a reasonable probability that a properly selected jury would have been less likely to convict. Had the Sixth Circuit believed Ambrose must demonstrate that a properly selected jury would not have convicted him—because he is bound by *Strickland*'s standard for actual prejudice—it would have said so. It did not.

Thus, when the court indicated that "[a]lthough the instant petitions do not involve a *Strickland* claim, this standard is appropriate[,]" *id*., it is reasonable to assume the court was referring to the standard it outlined, based upon *Hollis*, only one paragraph before—not the *Strickland* standard itself. The reference to *Strickland* is better understood as indicating that although *Hollis* involved a *Strickland* claim, the prejudice standard set forth in *Hollis* (less likely

to convict) is still applicable to this case, which does not include an ineffective assistance of counsel claim.

<div align="center">B</div>

Having concluded that, to demonstrate prejudice, Ambrose must show only that a properly selected jury would have been less likely to convict him, the Court moves directly to that question. For two independent reasons, Ambrose has satisfied his burden of showing actual prejudice to excuse his procedural default.

<div align="center">1</div>

First, based upon the evidence from Dr. Sommers, the Court concludes that a properly selected jury would have been less likely to find Ambrose guilty of his charges. For, as Dr. Sommers testified, more diverse juries are statistically less likely to convict.

<div align="center">i</div>

It is important to emphasize that the Sixth Amendment only demands that "the jury *venire* represent a 'fair cross-section' of the community[,]" *United States v. Suggs*, 531 F. App'x 609, 618 (6th Cir. 2013) (collecting cases) (emphasis added), it does not require that the petit jury selected from each venire also represent a fair cross-section of the community. *See*, *e.g.*, *Ambrose*, 684 F.3d at 645 (citing *United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990)). For this reason, the court in *Garcia-Dorantes*[11] chose not to consider Dr. Sommers's testimony, indicating that "even if the Court credits the petitioner's showing on this point as true"—that juries with more minority members are less likely to convict—"it is irrelevant to the question of actual prejudice." No. 05-10172, 2013 WL 5566667, at *8. The *Garcia-Dorantes* court's

---

[11] *Garcia-Dorantes* also involved the computer glitch that affected Kent County jury venires from 2001 to 2002. There, as here, the defendant offered Dr. Sommers's testimony from the September 16, 2013 hearing held in this Court to support the argument that "juries with more minority members are less likely to convict[,]" and thus "there is a reasonable probability that a properly selected jury would have been less likely to convict." *Garcia-Dorantes*, No. 05-10172, 2013 WL 5566667, at *8.

conclusion was based on the fact that more minority members in a jury venire will not assure their presence on the petit jury itself, and as such "[a] properly selected jury could well have been all white, with no minority members at all." *Id.* Accordingly, the court did not factor in Dr. Sommers's testimony, or the underlying evidence in support, that more diverse juries are less likely to convict categorically.

Seizing on this result, the State argues that even if Ambrose's jury venire had represented a fair cross-section of the community, "as a matter of probability, the petit jury would have been identical." Resp't's Second Supp. Br. 23. The State anchors its argument with the statistical analysis of Dr. Edward B. Rothman, Director for the Center of Statistical Consultation and Research at the University of Michigan. *See* Rothman Report, *attached as* Pet'r's Evid. Hr'g Ex., ECF No. 45.

In his report, Dr. Rothman indicated that he had been asked to "estimate the discrepancy between the percentage of African Americans over the age of 18 in Kent County, Michigan according to the 2000 census and the estimate of the percentage of African Americans in the jury pool for the same location during the period of April 2001 through August 2002." *Id.* at 1. This "discrepancy"—the difference between the number of potential African-American jurors in Kent County and the number of potential African-American jurors on Kent County jury venires—is known as "absolute disparity." As the Sixth Circuit outlined in *Ambrose*, "[a]bsolute disparity measures the difference between the percentage of a group in the general population and its percentage in the [jury venire]. For instance, if Asians constitute 10% of the general population and 5% of the [jury venire], the absolute disparity is 5%." 684 F.3d at 642 n.1 (citation omitted).

Based on the 2000 census data, Dr. Rothman concluded that approximately 8.24 percent of potential jurors in Kent County were African American. Rothman Report 2. Dr. Rothman

also indicated that the absolute disparity between potential African-American jurors "and the estimate of this same population from the jury pool between April 2001 and August 2002 is .0345." *Id.* at 1–2. Accordingly, if 8.24 percent represents the number of potential African-American jurors in Kent County, and there was an absolute disparity of 3.45 percent between that figure and the number of African Americans on Kent County jury venires, approximately 4.79 percent of Kent County jury venire members were African American during April 2001.[12]

The State goes on to suggest that raising the number of African Americans on jury venires by 3.45 percent—the amount necessary to render those venires representative of Kent County—would not make a statistically significant difference:

> [A] 3.45% absolute disparity would result in a loss of one prospective African-American juror (40 multiplied by 0.0345 equals 1.38, then rounded to one) for the entire venire. Since each prospective juror has only a 30% chance of being selected for the petit jury (12 slots for 40 prospective jurors), the loss of one prospective juror in the venire would not likely affect the actual composition of the petit jury.

Resp't's Second Supp. Br. 23 n.6.

But the State's calculus is not sound. The question is not how many *more* African Americans there should have been on a jury venire to represent a fair cross-section of Kent County, but how many *total* potential African-American jurors there should have been on each venire. So while it is true that, to represent a fair cross-section of Kent County in April 2001, an additional 3.45 percent of jury-venire members should have been African American, the relevant question is what should the *total* number of African-American jury-venire members have been—and the answer is 8.24 percent. 8.24 percent of 40 is approximately 3.3, and so it follows that for a jury venire with 40 members to be representative of Kent County (as of April 2001), about three venire members should be African American (3.3 rounded to the nearest whole person, of

---

[12] Calculated by subtracting absolute disparity found by Dr. Rothman (3.45 percent) from percentage of African Americans in the general population of Kent County (8.24 percent).

course).  So while the State suggests that adding to the venire one potential African-American juror would not make a difference to the eventual petit jury, the proper question is this: Beginning with three potential African-Americans jurors in a venire, is it reasonably likely that one would make it to the petit jury?

Calculating the chances for one of three African Americans to make it on to Ambrose's petit jury is more complicated.[13]  The analysis begins by calculating the odds that the first juror selected is *not* one of the three African Americans—37 (the number of prospective jurors that are not African American) divided by 40 (the total number of prospective jurors).  The result, .925, represents the chance that the first juror chosen is not African American: 92.5 percent.  After calculating the odds that the first juror selected is not African American, that result (.925) is then multiplied by the odds that the second juror selected is also not African American—36 (the number of non-African Americans that remain after the first juror is selected) divided by 39 (the total number of prospective jurors that remain).  Accordingly, .923 (36 divided by 39) was multiplied by .925, which results in .854; there is an 85.4 percent chance that the first two jurors selected would not be one of the three African-American voir dire members.

This process can be repeated for each of the twelve juror selections.[14]  The result establishes there is a 33.2 percent chance that, from a jury pool of 40 members that includes three African Americans, not one person on a twelve-member jury will be African American.  It follows that there is a 66.8 percent chance that at least one of the three African Americans will

---

[13] The State suggests that each prospective juror in a panel of 40 has "a 30% chance of being selected for the petit jury (12 slots for 40 prospective jurors) . . . ." Resp't's Second Supp. Br. 23 n.6.  But this is incorrect.  Indeed, 30 percent represents the proportion of the overall jury venire that will find itself on the petit jury of twelve, not the probability that any single prospective juror will make it to the petit jury.

[14] The end result is the product of the following equation (based on each computation rounded to the thousandths place): (37/40)*(36/39)*(35/38)*(34/37)*(33/36)*(32/35)*(31/34)*(30/33)*(29/32)*(28/31)*(27/30)*(26/29).

be selected for the petit jury.[15]  Thus, had Ambrose's jury venire represented a fair cross-section of his community (and included three African Americans), the odds are better than two out of three that one African American would have been selected for his petit jury.

Notably, in *Gracia-Dorantes*, the court was unwilling to credit Dr. Sommers's testimony because "[a] properly selected jury could well have been all white, with no minority members at all."  No. 05-10172, 2013 WL 5566667, at *8.  True enough; one statistician concluded that, "while it would be less likely, one also could expect approximately 2% of all venires to contain no African-American members."  *Ambrose*, 684 F.3d at 642 (ellipsis omitted).  However, while there is some chance that a properly-selected jury could include zero African-American members, a properly-selected jury could also contain three African-American members.  Or four. Or ten.  The *probability* that a result will occur is what should govern here, not the *possibility* for any one given result.

And the relevant data indicate that had Ambrose's venire been constitutionally assembled, the presence of approximately three African Americans could be expected.  That being the case, there is a 66.8 percent chance that one of those three would make it to the petit jury.  So this Court concludes that there is a reasonable probability that, had Ambrose's jury venire been representative of Kent County (and included three African Americans), at least one African American would have been selected for his petit jury.[16]  As a result, the Court proceeds to the evidence proffered by Dr. Sommers.

---

[15] Of course, it is important to note that this statistical probability is calculated in a vacuum, assuming that each potential juror has the same statistical chance of making it on to the petit jury regardless of race or other characteristics; there has been no consideration, for example, of for-cause challenges during the voir dire process. However, because various checks have been implemented to prevent striking jurors based on their race alone, *see Batson v. Kentucky*, 476 U.S. 79 (1986), along with the fact that the defense typically has *more* challenges to prospective jurors than the prosecution, the analysis is not undermined by these assumptions.

[16] The Court remains mindful of the Supreme Court's assertion in *Kiff* that "there is no way to determine what jury would have been selected under a constitutionally valid system, or how that jury would have decided the case[,]"

**ii**

Dr. Sommers testified that increasing a petit jury by only one African-American member makes that jury less likely to convict, regardless of the merits of the evidence.  And while Dr. Sommers acknowledged that the weight of the evidence plays the largest role in conviction decisions, he nevertheless made clear that "controlling for those factors, the jury's racial composition has a small but statistically significant effect."  Sept. 16, 2013 Hr'g Tr. 83, 84.  As a result, Dr. Sommers concluded, unequivocally, that a "more diverse" jury would have been "less likely to convict" Joseph Ambrose.  *Id*. at 19.

The State first argues that Dr. Sommers's testimony should not be considered because he "is suggesting that the very premise of the Sixth Circuit's decision in this case is incorrect[,]" and that neither "Sommers nor this Court has the authority to overrule binding Sixth Circuit precedent."  Resp't's Second Supp. Br. 24.  While the latter proposition is surely true, the former is not.  The Sixth Circuit directed this Court to determine whether a properly selected jury would have been less likely to convict.  *Ambrose*, 684 F.3d at 652.  Although the court explained that the "most important aspect to the inquiry is the strength of the case against the defendant[,]" *id*., it also concluded that "[t]his is not to say that the race of the jurors, defendant, and victim must be ignored."  *Id*. at 652 n.4.

There is compelling statistical evidence that a properly selected jury in this case would have been more diverse.  Focusing on the race of the prospective jurors, Dr. Sommers established that more diverse juries are less likely to convict.  His conclusion does not undermine the Sixth Circuit's directive, but rather aligns with it.

---

407 U.S. at 504, but without doubt the Court is bound by *Ambrose*, and the directive is to determine whether "a properly selected jury would have been less likely to convict."  684 F.3d at 652 (brackets and citation omitted).

The State also challenges the research Dr. Sommers relied upon, but it does not do so in any meaningful way.  Although the Sommers 2006 Study involved mock juries, and even if "mock jury studies are subject to much criticism," Resp't's Second Supp. Br. 27, the findings of the Sommers 2006 Study align with the W&B Study and the Bowers Study, which did not involve mock juries.  And even if the State is correct that there is a "dearth of studies involving African-American jurors[,]" *id.*, this does not mean that any existing studies should be ignored, including the Sommers 2006 Study.  This is buttressed by the fact that the State did not offer any studies that reached a contrary conclusion.

The State argues that the W&B Study is flawed for many reasons: (1) it was not conducted in Grand Rapids, Michigan; (2) "the study focused primarily on African-American defendants"; (3) it employed "secondary data"; and (4) the Study concluded that along with race, "the quantity of evidence and the type of attorney also mattered."  *Id.* at 28.  But these challenges, unsupported by expert testimony, do not undermine the Study's findings so as to prevent their consideration.  Although the W&B Study focused on four locales other than Grand Rapids—Maricopa County in Arizona; Los Angeles; The Bronx; and Washington, DC—those are urban areas not wholly unlike Grand Rapids, Michigan (a metropolitan area of over 1 million residents and the second largest city in Michigan).  The fact that the study did not focus on white defendants is irrelevant, Ambrose is not white.  While the W&B Study acknowledged that "the use of secondary data raises concerns about the strength of the results," the burden and expense of collecting data firsthand would be "extremely difficult and expensive" and "would take months, even years" to complete.  W&B Study 165, *attached as* Pet'r's Second Supp. Br. Ex. B.  And even though the W&B Study recognized that other factors play a role in jury verdicts, Dr.

Sommers made clear that "controlling for those factors, the jury's racial composition has a small but statistically significant effect." Sept. 16, 2013 Hr'g Tr. 84.

Next, the State contends that the Bowers Study is not reliable because it involved capital jury trials, which "are very different than the non-capital cases at issue." Resp't's Second Supp. Br. 28. While it is possible that the dynamics of a capital case and a non-capital case may be different, the Bowers Study—like the W&B Study and the Sommers 2006 Study—concluded "that the greater percentage of White jurors on the jury, the more likely the jury was to convict." Sept. 16, 2013 Hr'g Tr. 27. Convergent findings between the studies only enhances the reliability of the results, as Dr. Sommers explained. *Id*. at 20 ("if you use multiple research designs and produce converging findings from those multiple research designs, you're even more confident at that point in the reliability of the conclusions you're drawing."). So although the Bowers Study addressed capital juries, its findings support, and therefore enhance, the findings that relate to non-capital juries.

After attempting to undermine each of the three studies individually, the State proffers two law review articles and argues that drawing any conclusions about jury decision-making is inappropriate. The State claims the first article, by Wendy Parker entitled *Juries, Race, and Gender: A Story of Today's Inequality*, 46 Wake Forest L. Rev. 209, 236 (2011), stands for the proposition that "the issue of disparate jury outcomes is likely too complicated for simple conclusions." Resp't's Second Supp. Br. 34. And it is true that Ms. Parker's article contains that language. But the quoted language is located in a paragraph that follows this language: "Yet, I ultimately conclude that . . . white juror bias may be at issue—especially on all-white juries . . . ." Wendy Parker, *Juries, Race, and Gender: A Story of Today's Inequality*, 46 Wake Forest L. Rev. 209, 236 (2011). Ms. Parker also cites to studies that conclude "white juror bias exists,"

and that "[t]he idea of juror bias is consistent with many studies and with the enduring nature of racism.  To the extent that the juries studied herein were all white, *juror bias could very well cause disparate outcomes for African-American and Latino plaintiffs alleging race discrimination*."  *Id*. at 237, 238 (emphasis added).  Thus, this article does not establish that Dr. Sommers's conclusions are inappropriate for consideration.  Indeed, Ms. Parker cites to Dr. Sommers's research with approval.  *Id*. at 234 n.188.

The State's second article also does little to undermine the applicability of Dr. Sommers's research to this case.  The State argues that John Conley, William Turnier, and Mary Rose's article *The Racial Ecology of the Courtroom: An Experimental Study of Juror Response to the Race of Criminal Defendants*, 2000 Wisc. L. Rev. 1185 (2000), establishes that "existing research is flawed or inconclusive on the question of whether—and how—race impacts decision-making in the criminal courtroom in the context of a case like Ambrose's."  Resp't's Second Supp. Br. 34.  But the subject of Mr. Conley, Mr. Turnier, and Ms. Rose's research was not the effect that jurors' race has on their decisions, but rather how the race of the defendants and witnesses affects juror decision-making.  *See* John Conley, William Turnier, and Mary Rose, *The Racial Ecology of the Courtroom: An Experimental Study of Juror Response to the Race of Criminal Defendants*, 2000 Wisc. L. Rev. 1185, 1186 (2000) ("we designed and carried out a two-part experimental study of whether and how the race of *criminal defendants* and *the witnesses who testify in their trials* affects juror decisions about guilt." (emphasis added)).

The other articles the State references in passing fare no better.  For although one article stated that "[r]esearch on the impact of juror race using both actual and mock juries has yielded diametrically opposite findings," the article clarified that "[v]irtually all of the research on juror race was conducted prior to *Batson v. Kentucky*," which was decided almost thirty years ago.  M.

Juliet Bonazzoli, *Jury Selection and Bias: Debunking Invidious Stereotypes Through Science*, 18 QLR 247, 263, 263 n.82 (1998).  Moreover, this article was published in 1998, long before Dr. Sommers's research shed light on the issue.  And although another group of researchers concluded that "it remains unclear when and how strongly participant demographics influence jury decisions[,]" that group also established there is "a growing body of high-quality field research" that is "generally consistent with an ingroup–outgroup bias with regard to African-American defendants . . . ."  Dennis J. Devine, *et al*., *Strength of Evidence, Extraevidentiary Influence, and the Liberation Hypothesis: Data from the Field*, 33 Law & Hum. Behav. 136, 138 (2009).  That is, according to the study, African-American jurors have an in-group bias and thus are less likely to convict, African-American defendants like Ambrose.  In sum, none of the research cited by the State sufficiently undermines Dr. Sommers's conclusions to render them invalid or unworthy of consideration.

Finally, the State questions the reliability of Dr. Sommers's methodology.  It argues he "has never looked at the impact that a victim's race might have on the final verdict," and "admitted he had not read the trial transcripts of this case . . . ."  Resp't's Second Supp. Br. 29.  The issue presented by this case is whether the race of jury members makes a difference; the race of the victim is not the question.  And it is not for Dr. Sommers to weigh the strength of the evidence against Ambrose; his conclusions simply relate to explaining the psychological research addressing how the racial composition of a jury affects how likely it is to convict.  It is this Court's separate task to determine if the evidence against Ambrose was so great that the racial composition of his jury did not matter.

Based on Dr. Sommers's testimony, and the fact that there is a reasonable probability that a properly selected jury in Ambrose's case would have included at least one African American,

Ambrose has demonstrated actual prejudice to excuse his default so long as the evidence against him was not overwhelming.

<div align="center">iii</div>

It is important to remember that the Sixth Circuit emphasized that in any given case, there may be a transcript demonstrating a case "so strong, and defense so weak, that a court would consider it highly improbable that an unbiased jury could acquit" regardless of its racial composition. *Ambrose*, 684 F.3d at 652 (citation omitted). As the *Ambrose* court established, in such circumstances, "actual prejudice would not be shown." *Id*. Of course, this is no reason to ignore Dr. Sommers's testimony, or the research he relied upon, which establish that more diverse juries are less likely to convict categorically. It is simply a method for concluding that *despite* the fact that more diverse juries are less likely to convict, actual prejudice still may not exist in some cases based on the overwhelming strength of the evidence against a defendant.

Contrary to the State's insistence, the strength of the evidence against Ambrose was far from overwhelming. The prosecution's case relied upon two eyewitnesses who contradicted each other in many respects.[17] For example, Anderson testified that the day of the robbery, he and Morgan stopped to get food and were on their way to the store. Morgan testified the two men did not stop anywhere and had no destination in mind. Anderson claimed that Ambrose produced a gun—during the confrontation and inside the confines of a vehicle—that was over a foot long; Morgan never saw any weapons. Anderson claimed he exited the car first, Morgan

---

[17] The State argues that "[n]either Ambrose nor this Court should be permitted to question or re-determine the jury's credibility findings." Resp't's Supp. Br. 21. But that is to suggest—despite the fact that Ambrose was tried before an unconstitutionally selected jury—that any conclusion that jury made about witness credibility must be credited. Regardless, this assertion misses the point; although "assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims," *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003), a federal habeas court need not defer to the state-court factfinder's credibility determinations when reviewing an error for harmlessness. *See, e.g.*, *Vasquez v. Jones*, 496 F.3d 564, 578 n.12 (6th Cir. 2007); *Fulcher v. Motley*, 444 F.3d 791, 809 (6th Cir. 2006). Accordingly, contrary to the State's position, this Court need not defer to the jury's credibility findings with respect to Anderson and Morgan.

<div align="center">- 43 -</div>

disagreed.   Morgan remembered talking to Police Officers at Anderson's home; Anderson claimed to have gone home alone.   Moreover, Anderson indicated that he had no idea what a drug rental is, while Morgan indicated that he was familiar with what a drug rental is and that Anderson should know as well.   Aside from the fact that—at least according to their story—Anderson and Morgan promptly reported the crime, there was no other evidence linking Ambrose to the case.   Anderson's and Morgan's property was not recovered in Ambrose's possession.   The machine gun he allegedly used during the robbery was never recovered.   No evidence was found linking Ambrose to the vehicle he supposedly stole.   The State relied on two witnesses who did not remember many of the same events.

Not only did he contradict Morgan, Anderson also contradicted himself.   He claimed at the preliminary hearing that he had seen Ambrose at a mutual friend's home on multiple occasions.   During trial, Anderson claimed he and Ambrose had no friends in common and had never been at the same location.   Also during the preliminary examination hearing, Anderson testified that he handed $100 to Ambrose rather than his wallet.   Prelim. Tr. at 9.   Then, during trial, he testified that his "whole wallet" was grabbed not by Ambrose, but by "his buddy," Rickie Hicks.   Trial. Tr. vol. III, at 54.

Morgan's and Anderson's accounting of May 19, 2000, changed in other ways over time. Although neither man claimed a cellphone was taken from them during the preliminary hearing or at Ambrose's trial, Officer Stahl recalled that either Morgan or Anderson represented that a phone was taken during the robbery.   *Id*. at 136.   Officer Stahl also claimed that Anderson and Morgan told her that after the robbery, Ambrose "got in the passenger side front" seat before Hicks drove away—which, obviously, differs from Morgan's and Anderson's later testimony. *Id*. at 135–36.

- 44 -

Finally, there are numerous unresolved questions that simply went unexplained by the prosecution. Why did Anderson take his mother's car the day of the robbery instead of his own? Indeed, why did Anderson decide to take a car at all? He testified that he traveled less than one block to his cousin's house. If there was a carjacking and robbery, why were a cellphone, gold and silver jewelry, and a watch left in the stolen car after it was supposedly abandoned? Why would Ambrose waive down two men he knew and rob them at gunpoint, knowing how easily they could identify him? Why were Anderson and Morgan unable to locate the alley in which they were robbed? And what about Ambrose's mother? She learned that her car was stolen and could not believe it was not "all tore up" at the hands of the perpetrators. Trial Tr. vol. IV, at 37. Her point: If this was a robbery and carjacking, why did those responsible not loot her car?

All of this, considered together, rendered the evidence of Ambrose's guilt anything but overwhelming. Accordingly, the prosecution's case was not so strong, and the defense so weak, as to overcome Dr. Sommers's indication that a properly selected jury would have been less likely to convict Ambrose, satisfying the requirement that he demonstrate actual prejudice.

**2**

Ambrose presents an alternative argument to support his claim that he was prejudiced by the failure to assemble a jury venire composed of a fair cross-section of the community. He argues, rather pragmatically, that by reducing the likelihood of a mixed-race jury, the computer glitch also reduced the likelihood that members of the jury would be familiar with his life experience and therefore more accepting of his defense. Ambrose explains as follows:

> The proposition that an individual would lend his vehicle in exchange for drugs may seem far-fetched to a jury populated entirely by suburbanites from safe communities. But there is a "reasonable probability" that to a resident of a neighborhood plagued by these issues, [a drug rental] would be a more plausible explanation for this case.

Pet'r's First Supp. Br. 8.

At first blush, Ambrose's argument appears contrary to the constitutional objective of securing an impartial jury. Indeed, he seeks a jury venire composed of residents of neighborhoods plagued by drugs and violence, individuals who might—by their very nature—possess a better understanding of his defense. But his argument is not only corroborated by Dr. Sommers's testimony, but by Sixth Amendment jurisprudence as well.

The Sixth Amendment right to a jury drawn from a fair cross-section of the community is nothing new. In 1940 the Supreme Court declared that "[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." *Smith v. State of Texas*, 311 U.S. 128, 130 (1940). As a result, the exclusion of qualified groups from jury service "not only violates [the] Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." *Id*.

Some decades later, in *Peters v. Kiff*, the Supreme Court expressly acknowledged that excluding any large segment of the community from jury service has wide-ranging effect:

> When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.

407 U.S. at 503–04.

This idea was confirmed by the Court three years later in *Taylor v. Louisiana*, 419 U.S. 522 (1975). Quoting *Ballard v. United States*, 329 U.S. 187 (1946), the Court rejected the notion

that an "all-male panel drawn from various groups in the community would be as truly representative as if women were included":

> The thought is that the factors which tend to influence the action of women are the same as those which influence the action of men—personality, background, economic status—and not sex. Yet it is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men likewise do not act as a class. But, if the shoe were on the other foot, who would claim that a jury was truly representative of the community if all men were intentionally and systematically excluded from the panel? The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables. Yet a flavor, a distinct quality is lost if either sex is excluded.

*Taylor*, 419 U.S. at 532 (quoting *Ballard*, 329 U.S. at 193–94).

Just as the petitioner did in *Garcia-Dorantes*, and as foreshadowed by the Supreme Court in *Kiff* and *Taylor*, Ambrose has raised a credible claim that on the facts of this case, "[a] mixed-race jury might clearly have a special perception." *Garcia-Dorantes*, No. 05-10172, 2013 WL 5566667, at *8. The evidence reasonably allowed for competing inferences—whether Ambrose took Anderson's and Morgan's property by force or received the car in exchange for drugs—and the subjective perceptions, life experience, and common sense of the jurors, as shaped by their individual racial and cultural backgrounds, could carry considerable weight in deciding the facts. Based on the relevant facts and circumstances, when comparing the result reached by a jury "selected by systematic exclusion of blacks, with the result which would have been reached by a racially mixed jury," the Court would have greater confidence in the latter outcome, finding much less probability that racial bias had affected it. *Ambrose*, 684 F.3d at 652 n.4; *see also Garcia-Dorantes*, No. 05-10172, 2013 WL 5566667, at *8.

The State's only response is to minimize Ambrose's drug-rental defense, arguing that "there was absolutely no evidence presented at trial supporting a defense that no robbery occurred and that Anderson gave his car to Ambrose to satisfy a drug debt." Resp't's Second

- 47 -

Supp. Br. 19.  Now it is "black-letter law that a defendant in a criminal trial need not . . . produce

any evidence . . . ."  *United States v. Drake*, 885 F.2d 323, 323 (6th Cir. 1989) (citation omitted).

And during cross examination, counsel for Ambrose established both what a drug rental was, and

that people in Ambrose's community were—or should have been—familiar with "drug rentals."

Trial Tr. vol. III, at 72, 91.  Then, during closing arguments, counsel alluded to the fact that a

drug rental might be just the explanation for the events of May 19, 2000:

> I don't know if this was a drug rental.  I don't know what was going on, neither
> do you.  That's the job of the prosecution to give you evidence to tell you what
> was going on. . . .  But I brought that up.  I asked Mr. Anderson, I said, do you
> know what a drug rental is?  Oh, no, I don't know what that is.  Don't have any
> idea.  Never heard of that.  He's 25 years old.  He's close to his cousin.  They get
> together a lot.  Asked Mr. Morgan, he's only 20 years old. . . .  You know what a
> drug rent—oh sure, I know what that is.  And then he said well it's where people
> either give drugs to get something or give something to get drugs.  And wasn't it
> interesting as soon as I suggested well could that mean or have you ever heard of
> situations where a car was given up for drugs?  I didn't say that what was
> happening here.  I just said that was one of the examples. . . .  He right away, oh,
> but that's not what was going on here, not, mm-mm, not.  That's—that's not what
> was going on here.  I think he does protest too much.  That's not even what I was
> asking.

Trial Tr. vol. IV, at 84–85.  Thus, contrary to the State's suggestion, members of the jury that

were familiar with the concept of a drug rental might have evaluated Anderson's and Morgan's

testimony and all of the other evidence—or lack thereof—and concluded that there were

reasonable doubts as to whether Ambrose had taken the car by force.

Based on either Dr. Sommers's testimony, or the fact that his defense theory might have

been better understood by a mixed-race jury, Ambrose has demonstrated a reasonable probability

that a properly selected jury would have been less likely to convict him.  The record does not

disclose a case so strong, and a defense so weak, as to make it "highly improbable that an

unbiased jury could acquit."  Ambrose has thus demonstrated that he suffered actual prejudice as

a result of the Kent County jury selection glitch that systematically excluded minority jurors from his venire.

## V

Because Ambrose has demonstrated both cause and actual prejudice related to his failure to raise a contemporaneous objection to his unconstitutional jury venire, his procedural default is excused.  It is appropriate, therefore, to address the merits of Ambrose's fair cross-section claim.

## A

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), require habeas courts to give great deference to state court decisions on the merits of constitutional questions in criminal cases.  As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(1), (2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).  But in this case, "it is evident that the state courts rejected [Ambrose's] fair cross-section claim[] on procedural grounds, based on the failure to object to the jury panel at trial.  For this reason, AEDPA deference does not apply and the court reviews legal conclusions *de novo* and findings of fact for clear error."  *Ambrose*, 684 F.3d at 645.

## B

The Sixth Amendment "secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community."  *Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (citing *Taylor v. Louisiana*, 419 U.S. 522 (1975)).  To establish

a prima facie violation of the fair cross-section requirement, Ambrose must prove three elements: "(1) that the group alleged to have been excluded is a 'distinctive' group in the community; (2) that the representation of that group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to the systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).  If Ambrose establishes a prima facie violation, then the burden shifts to the State to show a "significant state interest [that is] manifestly and primarily advanced by those aspects of the jury-selection systems, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.* at 367–68.

As a threshold matter, it is undisputed that African Americans are a cognizable group, which satisfies the first of the three *Duren* requirements.  *See Lockhart v. McCree*, 476 U.S. 162, 175 (1986).  Thus, only the second and third elements are possibly contested here.

But in their supplemental briefs the parties do not address whether Ambrose can demonstrate a prima facie violation of the fair cross-section requirement.  This may have occurred because whether Ambrose can satisfy the second and third *Duren* requirements was briefed by the parties on the way to the Court's original conditional grant of Ambrose's habeas petition.  In that opinion, the Court concluded that the representation of African Americans was not fair and reasonable in relation to their number in the community, *see* Mar. 10, 2011 Order 14–18, ECF No. 56, and that the exclusion of potential African-American jurors was "systematic," *id.* at 19.  These conclusions were echoed by the court in *Garcia-Dorantes* upon review of the same evidence concerning the Kent County computer glitch.  *See* No. 05-10172, 2013 WL 5566667, at *9–*18 (finding a systematic "underrepresentation" of African Americans in the Kent County jury venire, which satisfied the petitioner's burden under the second and third

prongs of *Duren*).   The Court's conclusion on these two points is no different than it was in March 2011.   Ambrose has satisfied his prima facie showing of a violation of the fair cross-section requirement; a showing that has not been rebutted by the State.   His habeas petition will be granted.

## VI

Accordingly, it is **ORDERED** that Ambrose's petition for a writ of habeas corpus, ECF No. 1, is **CONDITIONALLY GRANTED**.   The State shall release Ambrose from custody unless it brings him to trial within 180 days.

Dated: June 3, 2014                                      s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge

<div style="border:1px solid black;">

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 3, 2014.

s/Tracy A. Jacobs
TRACY A. JACOBS

</div>